Terry JOHNSON, Plaintiff,

v.

TELE–CASH, INC., and County Bank of Rehoboth Beach, Delaware, Defendants.

No. CIV. A. 99–104–GMS.

United States District Court, D. Delaware.

Dec. 29, 1999.

William L. O'Day, Jr., of Law Offices of William L. O'Day, Jr., Wilmington, Delaware, Daniel A. Edelman, Kathleen M. Combs, James O. Latturner, Sheila A. O'Laughlin, Heather C. Sullivan of Edelman & Combs, Chicago, Illinois, for Plaintiff.

James D. Griffin, David R. Hackett, Griffin & Hackett, P.A. Georgetown, Delaware, Walter Weir, Weir & Partners, LLP, Philadelphia, PA, for Defendants.

## OPINION

SLEET, District Judge.

### I. INTRODUCTION.

On February 25, 1999, Terry Johnson filed a class action lawsuit with this court. In it, he alleges that Tele–Cash, Inc. and the County Bank of Rehoboth Beach, Delaware (the "defendants")[1] have violated both the Truth In Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* (1994), and the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.* (1994), by failing to properly disclose the excessively high rates of interest which they charge for their short-term loans and by requiring borrowers to consent to a complicated electronic fund transfer scheme in order to obtain these loans.[2]

On May 5, 1999, the defendants moved to stay these proceedings pending the outcome of arbitration.[3] In their motion, the defendants point out that Johnson's loan application contains an arbitration clause which prohibits him from filing suit and, instead, requires him to vindicate any claim that he may have against the defendants through binding arbitration. In opposition to the motion, Johnson claims that the arbitration clause is unenforceable as unconscionable since it would effectively eviscerate the purpose of the TILA by eliminating the possibility of class relief.

The court agrees. The intended purpose of the TILA was "to encourage class actions in the truth-in-lending context because of the apparent inadequacy of the Federal Trade Commission's enforcement resources and because of a continuing problem of minimum compliance with the Act on the part of creditors." *See Watkins v. Simmons & Clark, Inc.,* 618 F.2d 398, 400 (6th Cir.1980) (citing Sen. Rept. No. 93–278, at 14–15 (1973)). As a result, a ruling which compels arbitration seems contrary to the underlying purpose of the TILA. The court reaches the same conclusion with respect to Johnson's EFTA claims. For these reasons, the court will deny the defendants' motion to compel arbitration. It will also deny the defendants' motion to dismiss as it relates to Johnson's claims under the TILA, the EFTA, and for a declaratory judgment that the rate of interest charged by the defendants was unconscionable. The following sections explain the court's reasoning more thoroughly.

### II. BACKGROUND.

On July 10, 1998, Johnson applied for and received a short-term loan in the amount of $250 from the County Bank of Rehoboth Beach. The one-page loan agreement set forth an annual percentage rate of 917 percent and a finance charge of $88. As a result, Johnson was required to repay his $250 loan by making one payment of $338 on July 24, 1998—two weeks after he submitted his loan application and received the $250.

These terms were disclosed in a table located at the top of the loan agreement which looks something like this:

---

**1.** On May 20, 1999, the parties agreed to voluntarily dismiss the claims against a third defendant—West Suburban Bank.

**2.** On this point, Johnson alleges that, in order to obtain a loan, applicants must first open a checking account into which their wages are directly deposited. However, according to Johnson, the defendants immediately transfer these deposits out of these checking accounts into another account without providing the required notice to the borrowers. Johnson claims that, in order to obtain a loan, he had to irrevocably agree to this system of electronic transfers. Otherwise, the defendants would not extend him a line of credit. Put differently, he claims that terms were part of the loan agreement which the defendants drafted unilaterally.

**3.** · In the alternative, the defendants moved to dismiss Johnson's complaint on the grounds that the terms of the loan were adequately disclosed and, thus, no violation of the TILA occurred. In addition, the defendants contend that, given the factual allegations of the complaint, all of Johnson's remaining claims fail as a matter of law.

| | | | |
|---|---|---|---|
| ANNUAL PERCENTAGE RATE | % | Payment Schedule | |
| The cost of your credit as a yearly rate | 917.71 | You must make one payment of $ 338 on 7/24/98 | |
| | | | |
| FINANCE CHARGE | $ | | |
| The dollar amount the credit will cost you | 88 | Security Interest The Loan is unsecured | |
| | | | |
| AMOUNT FINANCED | $ | Late Charges You must pay a late charge of 5% of the | |
| The amount of credit provided to you on your behalf | 250.00 | late payment if your Loan is not paid within 10 day of the due date | |
| | | | |
| TOTAL OF PAYMENTS | $ | Prepayment If you pay your Loan in advance, you will | |
| The amount you will have paid after you have made all payments as scheduled | 338 | *not* be entitled to a refund of part of the finance charge | |

See below for addition information about nonpayment, default, any required payment in full before the scheduled date, and prepayment refunds and penalties

While this table is not an exact representation of the information since the margins of the original are slightly different, it is in all other respects a fairly accurate portrayal of the information available to Johnson at the time that he entered into the loan agreement.

In addition, at the bottom, right above the signature line, the loan agreement provided a "boiler plate" arbitration clause which, in relevant part, reads:

> **ARBITRATION:** You and we agree that *any* claim, dispute, or controversy between us ... and any claim arising from or relating to this Note, no matter by whom or against whom ..., *including* the validity of this Note and of this agreement to arbitrate disputes as well as claims alleging fraud or misrepresentation *shall* be resolved by binding arbitration .... This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. [§§ ] 1–16. Judgment upon the award may be entered by any party in any court having jurisdiction.

(emphasis added).

Below this paragraph, the loan agreement provides two others which state:

> **NOTICE: YOU AND WE WOULD HAVE HAD a RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH a COURT BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.**

> By signing and sealing below, you agree to all of the terms of this Note, including the agreement to arbitrate disputes.

With these facts in mind, this memorandum turns to a discussion of the relevant law.

## III. DISCUSSION.

Given the clear and explicit language of the loan agreement, compelling arbitration seems to be a logical ruling, especially in light of the "congressional declaration of a liberal federal policy favoring arbitration agreements." *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). However, this ruling would contravene the express congressional intent to "encourage the use of class actions as an important tool for enforcing Truth in Lending." *See Bantolina v. Aloha Motors, Inc.*, 419 F.Supp. 1116, 1120 (D.Haw.1976). For this reason the court will deny the defendants' motion.

### A. The Origin And Evolution Of The FAA.

Originally enacted in 1925, the FAA was adopted in an attempt to place arbitration agreements on the same level as other contracts and, thus, reverse the

"longstanding judicial hostility" to these agreements that American courts had inherited from their English ancestors. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *see also Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir.1999) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225–26, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)). In light of the purpose of the FAA, it should come as no surprise to learn that federal law presumptively favors the enforcement of arbitration agreements. *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225, 231 (3d Cir. 1998) (cited in *Harris*). For this reason, the FAA authorizes a district court to compel the arbitration of any issue covered by a valid and enforceable arbitration agreement when a party to that agreement commences a legal action without first attempting to arbitrate the dispute. *See* 9 U.S.C. §§ 3–4 (1994); *see also Southland Corp. v. Keating*, 465 U.S. 1, 11–12, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (also cited in *Harris*).

Here, Johnson does not (and probably cannot) argue that his dispute falls outside the scope of the arbitration agreement. In fact, given the breadth of the contractual provision,[4] it is impossible to see how Johnson could claim otherwise. As a result, he effectively concedes the point. Thus, the court is left with only one question—namely, is the arbitration clause enforceable?

B. The Enforceability Of The Arbitration Clause With Respect To Johnson's TILA Claims.

■ On this point, Johnson contends that the arbitration clause is not enforceable because (1) Congress expressly intended to preclude the arbitration of claims arising under the TILA by explicit-ly allowing for the possibility of class relief under the statute and (2) the arbitration agreement itself is unconscionable. Because the court agrees with Johnson's first argument, it need not address the second.

Citing to 15 U.S.C. § 1640 (1994), Johnson argues that Congress expressed a clear intent to guarantee class relief under the TILA by allowing individuals to bring a class action under the statute. Since an arbitrator cannot award this type of class-wide relief, Johnson contends that this court cannot compel the arbitration of this matter.

The most convincing rejection of this argument was expressed in *Lopez v. Plaza Fin. Co.*, No. 95–C–7567, 1996 WL 210073, at *2–3 (N.D.Ill. Apr.26, 1996). There, the district court stated that:

> It is true that compelling arbitration ... will eliminate [the] plaintiff's ability to arbitrate his claims on behalf of a class. Nonetheless, this result is required because Congress has not created a statutory right to bring class actions under [the] TILA .... Section 1640, cited by [the] plaintiff in support of the proposition that a statutory right exists, does not establish a right *per se;* it only sets forth a limit on liability under class actions.... Where an enforceable arbitration clause allows only for individual arbitration, a class will not be certified. Therefore, [the] plaintiff's inability to bring class claims under [the] TILA is of no legal consequence.

*Id.* at *3 (citing *Champ v. Siegel Trading Co.*, 55 F.3d 269, 276–77 (7th Cir.1995)); *see also Sagal v. First USA Bank, N.A.*, 69 F.Supp.2d 627, 631–32 (D.Del.1999) (citing *Lopez*).

In addition to concluding that the plaintiff had no statutory right to maintain a class action under the TILA, the *Lopez*

---

4. As mentioned earlier, the arbitration clause states, in relevant part, that "any claim, dispute, or controversy between [Johnson and the defendants] ... and any claim arising from or relating to this Note, no matter by whom or against whom ..., including the validity of this Note and of this agreement to arbitrate disputes as well as claims alleging fraud or misrepresentation shall be resolved by binding arbitration ...."

court also found that Congress never intended to preclude the arbitration of TILA claims because the "[p]laintiff ha[d] provided no compelling legal authority to support th[is] proposition ...." *Id.* As the *Lopez* court stated, "[w]ithout such authority, [the] plaintiff's argument must fail." *Id.* While it is not clear what authority (if any) the *Lopez* plaintiff cited, the legislative history of Section 1640 suggests that Congress was trying to encourage the use of class actions as a means for enforcing the TILA. As a result, the court believes that a strong argument can be made that TILA claims should not be arbitrated since this forum cannot provide the class-wide relief available in the courts.

In 1974, Congress amended Section 1640 to provide a cap on liability for class actions brought under the TILA. *See Watkins v. Simmons & Clark,* 618 F.2d 398, 400 (9th Cir.1980); *Bantolina v. Aloha Motors, Inc.,* 419 F.Supp. 1116, 1119–20 & n. 10 (D.Haw.1976). Prior to the amendment, upon a showing of injury, each individual plaintiff was entitled to a minimum award of $100 under the statute. *See* 15 U.S.C. § 1640 (1970). However, in class action lawsuits which involved millions or tens of millions of consumers, granting this minimum amount of recovery to each individual plaintiff would result in an astronomical damage figure. For this very reason, numerous federal courts refused to certify class actions under the TILA since the "allowance of thousands of minimum recoveries ... would carry to an absurd and stultifying extreme the specific and essentially inconsistent remedy Congress prescribed as the means of private enforcement." *See Ratner v. Chemical Bank of New York Trust Co.,* 54 F.R.D. 412, 414 (S.D.N.Y.1972). In response to these decisions, Congress amended the statute to provide a limit on the maximum recovery available under the TILA. This amendment was intended to encourage the federal courts to begin certifying class actions in Truth in Lending lawsuits. *See Watkins,* 618 F.2d at 400 n. 6 (citing Sen. Rept. No. 93–278, at 14–15 (1973)); *see*

*also Bantolina,* 419 F.Supp. 1116, 1119–20 & n. 11 (citing same).

In capping the maximum amount of recovery in class action lawsuits under the TILA at "the lesser of $500,000 or 1 per centum of the net worth of the creditor," 15 U.S.C. § 1640 (1994), Congress expressly stated that it "wishe[d] to avoid any implication that the ceiling on class action recovery [wa]s meant to discourage use of the class action device." *See Watkins,* 618 F.2d at 401 & n. 7 (citing Sen. Rept. No. 94–590, *reprinted in* 1976 U.S.Code Cong. & Admin. News, at 431, 438). Instead, this amount was "meant to limit the exposure of creditors to vast judgments whose size would depend on the number of members who happened to fall within the class" while, at the same time, "provid[ing] ... a workable structure for private enforcement." *See id.* (citing same). As the Congress noted, "[s]mall businesses were protected by the 1 [percent] measure, while a potential half-million dollar recovery ought to act as a significant deterrent to even the largest creditor." *See id.* (citing same).

In adopting these amendments, Congress explained that "[t]he purpose of the civil penalties under [the] Truth in Lending [Act] was to provide creditors with a meaningful incentive to comply with the law without relying on an extensive new bureaucracy." Sen. Rept. No. 93–278, at 14. However, because "this objective c[ould] be achieved without subjecting creditors to enormous penalties for violations which did not involve actual damages and may be technical in nature," the Congress decided to "put[ ] a reasonable limit on a creditor's maximum class action liability" since it "seem[ed] to be in the best interests of both creditors and consumers." *Id.* In so doing, Congress concurred with an earlier conclusion by the Federal Reserve Board that "potential class action liability [wa]s an important encouragement to the voluntary compliance which [wa]s so necessary to [e]nsure nation-wide adherence to uniform disclosure" since "[m]ost

Truth in Lending violations do not involve actual damages and ... some meaningful penalty provisions are therefore needed to [e]nsure compliance." *Id.* at 15 (citations omitted).

In light of this language, one district court has concluded that:

> The possibility of class-action exposure is *essential* to the prophylactic intent of the Act and is necessary to elevate truth-in-lending lawsuits "from the ineffective 'nuisance' category to the type of suit which has enough sting to insure that management will strive with diligence to achieve compliance."

*See Bantolina,* 419 F.Supp. at 1120 (quoting Sen. Rep. No. 93–278, at 36–37) (emphasis added).

In *Watkins,* the Ninth Circuit reached the same conclusion, stating that the "legislative history surrounding these amendments [to the TILA] convinces us that Congress did intend, by them, to encourage class actions and to use the threat of class action recoveries to force compliance with the Act." 618 F.2d at 402.

Here, if the court compelled arbitration, Johnson would be prevented from seeking and, therefore, obtaining this type of relief. As a result, the federal statute would be effectively stripped of its "sting" and reduced to nothing more than its mere "nuisance" value. *Cf. Bantolina,* 419 F.Supp. at 1120. Consequently, there would be no way to "provide creditors with a meaningful incentive to comply with the law" since they would no longer be facing the "meaningful penalty provisions [which were] needed to [e]nsure compliance." *See* Sen. Rept. No. 93–278, at 14, 15. In other words, without a guarantee that Johnson may "effectively ... vindicate [hi]s statutory cause of action in the arbitral forum," it is questionable that the "statute will continue to serve both its remedial and deterrent function." *Cf. Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). In light of this "inherent conflict" between compelling arbitration and the underlying purposes of the TILA, the court will deny the defendants' motion. *See id.*

In *Mitsubishi,* the Supreme Court did state that "We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." 473 U.S. at 628, 105 S.Ct. 3346. As the Supreme Court has later clarified, this intent is also "deducible from ... an inherent conflict between arbitration and the statute's underlying purposes." *See McMahon,* 482 U.S. at 227, 107 S.Ct. 2332 (citing *Mitsubishi,* 473 U.S. at 632–37, 105 S.Ct. 3346).

### 1. The *Mitsubishi* decision.

The central issue in *Mitsubishi* revolved around whether the plaintiff would be able to recover treble damages for the defendant's anti-competitive behavior under the Sherman Act. *Id.* at 635–36, 105 S.Ct. 3346. According to the plaintiff, if the dispute proceeded to arbitration, there was a risk that the arbitrator might apply Swiss law and, as a result, deny the plaintiff the opportunity to recover treble damages for activities which clearly occurred in the United States. *Id.*

In compelling arbitration, the Supreme Court noted that both of the parties agreed that U.S. law applied to the dispute. *Id.* at 636–37 & n. 19, 105 S.Ct. 3346. As a result, the Court was not concerned that the arbitration clause might be interpreted as a waiver of the plaintiff's statutory right to recover treble damages. *Id.* In fact, as the Supreme Court made clear when it compelled arbitration, if the "choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of [the plaintiff's] right to pursue statutory remedies for anti-trust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n. 19, 105 S.Ct. 3346. Thus, because the plaintiff could "effectively ...

vindicate its statutory cause of action in the arbitral forum," the Court was willing to compel arbitration since there was no question that the Sherman Act "w[ould] continue to serve both its remedial and deterrent function." *Id.* at 637, 105 S.Ct. 3346.

### 2. The *Mitsubishi* decision as it applies to Johnson's case.

■ Admittedly, the TILA does not confer a statutory right to "the lesser of $500,000 or 1 per centum of the net worth of the creditor." 15 U.S.C. § 1640. Instead, the Act only states that, "in the case of a class action," the plaintiff may recover this amount. *Id.* In this respect, the *Lopez* court was entirely correct. "Congress has not created a statutory right to bring class actions under [the] TILA." 1996 WL 210073 at *3. However, Congress did adopt this cap in an attempt to "encourage class actions and to use the *threat* of class action recoveries to force compliance with the Act." *See Watkins,* 618 F.2d at 402 (emphasis added); *see also Bantolina,* 419 F.Supp. at 1120 (recognizing the class action device as "an important tool [for] enforcing Truth in Lending"). Thus, without the possibility of class action liability looming on a creditor's horizon, there is a very real possibility that these entities will not voluntarily comply with the Truth–in–Lending regulations.

■ For example, under Section 1640, Johnson as an individual can only recover a maximum of $1,000 from the defendants. 15 U.S.C. § 1640(a)(1)(2)(a). However, as a representative of a class, he could obtain as much as 500 times that amount. *See id.* at § 1640(a)(1)(2)(B) (capping the maximum allowable recovery at $500,000). Obviously, the latter penalty ensures greater compliance with the TILA. However, by enforcing the boiler plate arbitration clause which is contained in this (and every other) one-page loan agreement unilaterally drafted by the defendants, the court would be allowing them to effectively insulate themselves against the very statutory penalties which Congress deemed necessary to "provide creditors with a meaningful incentive to comply with the law." *See* Sen. Rept. No. 93–278, at 14. For this reason, this court doubts whether the TILA could "continue to serve *both* its remedial and deterrent function[s]" if the arbitration clause was enforced. *See Mitsubishi,* 473 U.S. at 637, 105 S.Ct. 3346 (emphasis added). Thus, after considering the facts of this case in light of the teachings of the *Mitsubishi* decision, this court finds that there is "inherent conflict" between compelling arbitration and the underlying purposes of the TILA. The court will, therefore, deny the defendants' motion to compel the arbitration of Johnson's TILA claims.[5]

---

**5.** Because the court has resolved the defendants' motion on these grounds, it need not reach Johnson's argument that the arbitration clause is itself unconscionable. However, because Johnson has also asked for a declaration that the clause is unconscionable, the court feels obligated to briefly address this argument.

Delaware law allows a court to rescind a contract on the grounds of unconscionability. *See* Del.Code Ann. tit. 6, § 2–302 (1998). However, the Delaware Supreme Court has held that "mere disparity between the bargaining power of parties to a contract will not support a finding of unconscionability." *See Graham v. State Farm Mut. Auto. Ins. Co.,* 565 A.2d 908, 912 (Del.1989). Instead, in order for a court to find unconscionability, "the party with the superior bargaining power [must have] used it to take advantage of his

weaker counterpart" by drafting terms that are "so one-sided as to be oppressive." *Id.* (citing *Tulowitzki v. Atlantic Richfield Co.,* 396 A.2d 956, 960 (Del.1978)).

In *Graham,* the Delaware Supreme Court compelled arbitration in the face of a clause which was virtually identical to the one contained in Johnson's loan agreement. The clause at issue in *Graham* obligated the parties to enter into binding arbitration and, like the one here, was offered on a "take-it or leave-it" basis. *Id.* at 912–13. However, because the clause did not create a procedure which favored one party over another, the *Graham* court found it to be fair. *Id.* at 913. Thus, while unarguably a contract of adhesion, there can be little doubt that, under Delaware law, the arbitration clause which was contained within Johnson's loan agree-

C. The Enforceability Of The Arbitration Clause With Respect To Johnson's Claims Under The EFTA.

■ Unfortunately, the parties only address Johnson's EFTA claims in passing. As a result, the court is left with little guidance on whether it should compel the arbitration of these claims.

In their opening brief, the defendants issue a blanket statement that "[n]othing contained in the TILA or EFTA express[es] a congressional intent to preclude arbitration as a forum for litigating consumer claims brought under those statutes."

However, after reviewing the text of the EFTA, the court notes that the statute contains a provision entitled "civil liability" which sets forth a cap on class action damages that is virtually identical to the one provided under the TILA. *Compare* 15 U.S.C. § 1693m (1994) ("[I]n the case of a class action, . . . the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $500,-000 or 1 per centum of the net worth of the defendant.") *with* 15 U.S.C. § 1640(a) (1994) ("[I]n the case of a class action, . . . the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same creditor shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor."). Thus, even though there is no legislative history which explains why Congress adopted the same ceiling on class action liability under the EFTA, the court presumes that Congress was trying to encourage courts to certify class actions under this statute as well. Given this "inherent conflict" between compelling arbitration and the underlying purpose of the EFTA, the court will deny the defendants' motion to compel arbitration as it relates to Johnson's EFTA claims. *Cf. Mitsubishi,* 473 U.S. at 637, 105 S.Ct. 3346.

ment was not so unfair as to be unconsciona-

D. The Enforceability Of The Arbitration Clause With Respect To Johnson's Claims For A Declaratory Judgment.

■ In their submissions, the parties failed to address whether Johnson's requests for a declaratory judgment should be heard by an arbitrator instead of this court. However, requiring the parties to arbitrate a minor portion of their dispute while they are simultaneously litigating the major issues before a court of law would be highly inefficient. For this reason, the court will not compel the arbitration of Johnson's claims seeking a declaratory judgment.

E. The Court Will Deny The Defendants' Motion To Dismiss In Part.

In their motion to dismiss, the defendants essentially advance two arguments. First, they contend that Johnson's TILA claims fail as a matter of law since (1) any arguable violation they committed is, at best, a mere technicality and (2) in any event, Johnson has failed to allege that he has suffered any actual injuries as a result of this alleged violation. Second, the defendants argue that Johnson's claims under the EFTA are likewise inadequately plead and, consequently, also fail as a matter of law.

■ The court disagrees. Because the law prohibits even "technical" violations of the TILA and because Johnson's allegations are sufficiently pled to state a cause of action under both the TILA and EFTA, the court will deny the defendants' motion to dismiss as it relates to these claims. Nevertheless, the court will grant the motion to dismiss with respect to Johnson's request for a declaratory judgment that the arbitration clause is unconscionable since the terms of this agreement were not so one-sided as to be oppressive.

ble.

### 1. Johnson's TILA claims.

Under 15 U.S.C. § 1632,

The terms "annual percentage rate" and "finance charge" shall be disclosed *more conspicuously* than other terms, data, or information provided in connection with a transaction, except information relating to the identity of the creditor.

15 U.S.C. § 1632(a) (1994) (emphasis added); *see also* 12 C.F.R. 226.17(a)(2) (1998) (Regulation Z).

Here, the one-page loan agreement signed by Johnson contained the following table which set forth, *inter alia,* the annual percentage rate of the loan and the finance charge.

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | %<br>917.71 | Payment Schedule<br>You must make one payment of $ 338 on<br>7/24/98 |
|---|---|---|
| FINANCE CHARGE<br>The dollar amount the credit will cost you | $<br>88 | Security Interest The Loan is unsecured |
| AMOUNT FINANCED<br>The amount of credit provided to you on your behalf | $<br>250.00 | Late Charges You must pay a late charge of 5% of the late payment if your Loan is not paid within 10 day of the due date |
| TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled | $<br>338 | Prepayment If you pay your Loan in advance, you will *not* be entitled to a refund of part of the finance charge |

See below for addition information about nonpayment, default, any required payment in full before the scheduled date, and prepayment refunds and penalties

---

Thus, while it seems safe to say that the table "conspicuously disclosed" both the annual percentage rate and finance, it also seems fair to say that this information was not disclosed "more conspicuously" than the surrounding information, *see* 15 U.S.C. § 1632(a), since the "annual percentage rate" and the "finance charge" appear in the same-sized font with the same emphasis as the loans terms concerning the "amount financed" and the "total of payments."

As another district court stated in a strikingly similar context,

While the terms "annual percentage rate" and "finance charge" are the most conspicuous terms on the page, [the terms] "amount financed" and "total of payments" are also prominently displayed. As a result, the four terms are *identically* presented and the defendants have failed to disclose the "annual percentage rate" and "finance charge" *more conspicuously* than the other terms.... While this [c]ourt acknowledges that this amounts to a technical violation, ... the [p]laintiffs' claims sur-

vives the motion to dismiss because [the] TILA requires *strict compliance* with its terms.

*See Brown v. C.I.L., Inc.,* No. 94–C–1479, 1996 WL 164294, at *7 (N.D.Ill. Apr. 1, 1996) (emphasis added). In fact, the disclosure statement in *Brown* was virtually identical to the one at issue in this litigation. As the district court described,

The top third of this box is subdivided into a horizontal row of four one-inch boxes. The first two boxes (reading from left to right) contain the terms "Annual Percentage Rate" and "Finance Charge" in bold capital letters, along with the appropriate values. The second two boxes contain the terms "Amount Financed" and "Total of Payments," also in bold capital letters.

*Id.* (citing U.S. Mag. Rept. & Rec., at 36).

In response, the defendants contend that, in 1980, Congress amended the TILA to "eliminate lawsuits, like [this one], based on hyper-technical violations of the

TILA." Quoting *In re Russell,* the defendants claim,

> In 1980, Congress ... softened the bite of the TILA somewhat by enact[ing] the Truth–In–Lending Simplification and Reform Act .... At that point, Congress became convinced that one of the consequences of the TILA was a large volume of lawsuits based upon hypertechnicalities which no longer worked in the best interests of our society.

72 B.R. 855, 862 (Bankr.E.D.Pa.1987) (citing Pub.L. No. 92–221, Title VI (1980)); *see also Laws v. Payday Loan Corp. of Illinois,* No. 98–C–5562, 1999 WL 966964, at *2–3 (N.D.Ill. Oct.1, 1999).

The court is not persuaded by this argument.

### a. The legislative history does not support this argument.

In 1980, Congress did amend the TILA but just not in the manner that the defendants claim. As Congress explained in adopting the amendments to the TILA, it hoped to "provide the consumer with clearer credit information" and to "make creditor compliance easier." *See* Sen. Rept. No. 96–73, at 2 (*reprinted in* 1980 U.S.Code Cong. & Admin. News, at 280). Under the prior law, the creditor only needed to disclose information "clearly and conspicuously" and in a "meaningful sequence." *See Lamar v. American Fin. Sys. of Fulton County, Inc.,* 577 F.2d 953, 954 (5th Cir.1978) (citing 15 U.S.C. § 1631(a) (1974); 12 C.F.R. § 226.6(a) (1974)). Given this fairly ambiguous language, disclosures were often "lengthy and difficult to understand." *See* Sen. Rept. No. 96–73, at 2. In fact, as Congress observed when it amended the TILA,

> [T]he typical disclosure statement ... is not an effective communication device. Most disclosure statements are lengthy, written in legalistic fine print, and have essential truth in lending disclosures scattered among various contractual terms. The result is a piece of paper which appears to be "just another legal document" instead of the simple, concise disclosure form Congress intended.

*Id.* at 3.

Not surprisingly, consumers were often confused about the terms of these agreements, and creditors, who had "sincerely tried to comply with the [A]ct," often "found themselves in violation and subject to litigation" because they were unable to "keep[ ] current with [the] steady stream of administrative interpretations and amendments, as well as highly technical judicial decisions," concerning the Act. *Id.* at 2. For this reason, Congress sought to "simplify the typical truth in lending statement" by amending the TILA's disclosure requirements.

For starters, Congress replaced the "clearly and conspicuously" standard with the following requirement:

> The terms "annual percentage rate" and "finance charge" shall be disclosed more conspicuously than other terms, data, or information provided in connection with a transaction, except information relating to the identity of the creditor.

*See* The Truth In Lending Simplification and Reform Act, Pub.L. No. 96–221, § 122(a), 94 Stat. 168, 175 (1980) (codified as amended at 15 U.S.C. § 1631(a) (1994)). Given this change, it is highly doubtful that Congress would consider the failure to follow the explicit requirements of the new law as a "technical violation." *Cf. Shroder v. Suburban Coastal Corp.,* 729 F.2d 1371, 1379–80 (11th Cir.1984) ("[T]he applicable standard is strict compliance with the technical requirements of the Act.... Where the terms 'annual percentage rate' and 'finance charge' are not printed more conspicuously than other terminology in the ... disclosure statement, the violation is a serious one which entitles the plaintiffs to recovery.") (citing *Dixey v. Idaho First Nat'l Bank,* 677 F.2d 749, 751 (9th Cir.1982)).

Moreover, to provide creditors with some guidance on how to comply with the new regulations, Congress included a "sim-

plified statement prepared by the Federal Reserve Board" which "illustrate[d] what a disclosure statement prepared in accordance with this bill's provisions would resemble." *Id.* at 3, 4. The first portion of this statement looked something like this:

ANNUAL PERCENTAGE RATE (the cost of your credit expressed as a yearly rate) _____ %

FINANCE CHARGE (the dollar amount the credit will cost you) ................... $ _____
 It does not include a $ _____ fee for filing a security interest.

AMOUNT FINANCED (the amount of credit you will receive) .................... $ _____

TOTAL OF PAYMENTS (the amount you will pay when you make all the payments) $ _____
 The total of payments will be paid in _____ monthly installments of $_____
 which are due on the _____ day of each month. The first payment is due on
 _____ and the last payment on _____.

TOTAL SALE PRICE (the total cost to purchase your credit, including a down
 payment of $ _____) ........................................... $ _____

As this illustration makes clear, the sample form which Congress provided as an example to creditors disclosed "more conspicuously" the "annual percentage rate" and "finance charge" for the loan. Consequently, the defendants' argument that Congress amended the TILA to "eliminate lawsuits, like [this one], based on hypertechnical violations of the TILA" misses the mark since, in 1980, Congress amended the TILA to discourage creditors from providing the very type of disclosures which are contained in the one-page loan agreement at issue in this case. While this decision may seem "hyper-technical," as the Seventh Circuit has observed in a similar context, "hyper-technicality reigns" in TILA lawsuits. *See Cowen v. Bank United of Texas, FSB,* 70 F.3d 937, 941 (7th Cir.1995).

b. Johnson's ability to recover statutory damages for violations of the TILA.

 The defendants also contend that Johnson's TILA claims fails as a matter of law because he has failed to allege that he suffered any actual damages as a result of the defendants' apparent violation of the Act's the disclosure requirements. However, as countless circuit courts have noted, the

 TILA is a prophylactic measure that creates a system of "private attorneys general" to aid its enforcement. In order to penalize non-complying creditors and to deter future violations, the private attorneys general may recover the statutory penalties even if they have not sustained any actual damages or even if the creditors are guilty of only minute deviations from the requirements of [the] TILA and implementing Regulation Z.

*See, e.g., Davis v. Werne,* 673 F.2d 866, 869 (5th Cir.1982); *see also Gambardella v. G. Fox & Co.,* 716 F.2d 104, 108 n. 4 (7th Cir.1983) ("It is well settled ... that proof of actual deception or damages is unnecessary to a recovery of statutory damages under 15 U.S.C. § 1640(a)."); *Dryden v. Lou Budke's Arrow Fin. Co.,* 630 F.2d 641, 647 (8th Cir.1980) ("TILA plaintiffs ... need not show that they have sustained actual damages stemming from the TILA violations ... before they can recover ... statutory damages ....").

 While the defendants claim that Congress effectively overruled these decisions when it amended the statute to limit a creditor's exposure to the statutory damages provision relating to certain disclosure violations, the court disagrees.

i. The express language of the statute.

 In 1980, when it was reforming the TILA to simplify its disclosure requirements, Congress also adopted an amendment which was "intended to restrict the scope of creditor civil liability for statutory penalties to only those disclosures which are of material importance in credit shop-

ping." *See* Sen. Rept. No. 96–73, at 17 (*reprinted in* 1980 U.S.Code Cong. & Admin. News, at 280, 294). According to Congress, it "believe[d] that this [measure] w[ould] eliminate litigation based on purely technical violations of the [A]ct." *Id.* In relevant part, this amendment provided that:

> In connection with the disclosures referred to in [Section 1638 of this Title], a creditor shall have liability determined under paragraph (2) [the statutory damages provision] only for failing to comply with the requirements . . . of paragraph (2) (insofar as it requires disclosure of the "amount financed"), (3), (4), (5), (6), or (9) of [Section 1638(a) ] . . . .

*See* The Truth In Lending Simplification and Reform Act, Pub.L. No. 96–221, § 615(b), 94 Stat. 168, 181 (1980) (codified as amended at 15 U.S.C. § 1640(a) (1994)).

The specific paragraphs of Section 1638 listed in the amendment require a creditor to make the following disclosures:

> (2) The "amount financed," using that term, which shall be the amount of credit of which the consumer has actual use. . . .
> (3) The "finance charge," not itemized, using that term.
> (4) The finance charge expressed as an "annual percentage rate," using that term. . . .
> (5) The sum of the amount financed and the finance charge, which shall be termed the "total of payments."
> (6) The number, amount, and due dates or periods of payments scheduled to repay the total of payments. . . . [and]
> (9) Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction or (B) property not purchased as part of the credit transaction identified by item or type.

*See* 15 U.S.C. § 1638(a)(2)(A), (3)-(6), (9).

Noting that Section 1638 expressly "refer[s] to" the disclosure of the "annual percentage rate" and the "finance charge," the defendants claim that Section 1640 therefore limits their liability to only those damages which Johnson actually suffered. *See* 15 U.S.C. § 1640(a). However, Section 1638 only requires a creditor to set forth these specific terms along with explanations which describe them. 15 U.S.C. § 1638(a). Nowhere does Section 1638 require these terms to be "disclosed more conspicuously than other terms, data, or information provided in connection with a transaction." *See* 15 U.S.C. § 1632(a). Instead, this disclosure requirement is found in Section 1632. Thus, it does not appear that the specific violation alleged by Johnson is "[i]n connection with the disclosures referred to in [S]ection 1638" as required by Section 1640. *See* 15 U.S.C. § 1640(a). As previously stated, this violation instead appears to be in connection with the disclosures referred to in Section 1632. As a result, the defendants seem to fall outside the express exception which Congress provided.

Furthermore, even if the disclosures at issue fell solely within the scope of Section 1638 because Johnson was engaging in a transaction "other than an open end credit plan," *see* 15 U.S.C. § 1638, the court notes that the disclosure requirements set forth in Section 1632 expressly state that "[t]he terms 'annual percentage rate' and 'finance charge' shall be disclosed more conspicuously than other terms, data, or information provided in connection with a transaction . . . ." 15 U.S.C. § 1632(a). Since Section 1632 precedes Section 1638, the court presumes that Congress intended a violation of Section 1632(a) to be treated as a violation of Section 1638(a)(3) and 1638(a)(4). *But see Laws*, 1999 WL 966964, at *3 n. 2. This conclusion is supported by the legislative history.

ii. The statute's legislative history.

In 1980, Congress enacted Sections 1632 and 1640 simultaneously. As previously explained, Section 1632 replaced the previous "clearly and conspicuously" stan-

dard, which had led to lengthy and confusing disclosure statements, with the "more conspicuously" standard in an effort to "provide the consumer with clearer credit information" and to "make creditor compliance easier." *See* Sen. Rept. No. 96–73, at 2 (*reprinted in* 1980 U.S.Code Cong. & Admin. News, at 280). As a result, it would seem odd to conclude that this disclosure was not "of material importance in credit shopping." *See* Sen. Rept. No. 96–73 at 17. In fact, as the Eleventh Circuit has noted,

> [T]he terms "finance charge" and "annual percentage rate" are among the *material* terms affecting credit shopping and are protected by civil liability. Where the[se] terms ... are not printed more conspicuously than other terminology on the Truth–In–Lending disclosure statement, the violation is a *serious* one which entitles the plaintiffs to recovery.

*See Shroder,* 729 F.2d at 1380 (emphasis added) (citing *Dixey,* 677 F.2d at 752).

Thus, while Congress did intend to "eliminate litigation based on purely technical violations of the [A]ct" when it enacted Section 1640, the court would be hard pressed to conclude that the violations alleged by Johnson fall into this category.

Consequently, in the event that Johnson establishes a violation of the disclosure requirements, his recovery is limited only by provisions of subsections (2)(A) and (2)(B) which respectively cap individual and class action awards at "twice the amount of any finance charge in connection with the transaction" or "not ... more that the lesser of $500,000 or 1 per centum of the net worth of the creditor" taking into account the "amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional." *See* 15 U.S.C. §§ 1640(a)(2)(A), 1640(a)(2)(B), 1640(a).

### 2. Johnson's EFTA claims.

In their motion to dismiss, the defendants contend that Johnson has not adequately plead his EFTA allegations. Moreover, they claim that, given the facts of this case, he cannot possibly plead a cause of action under the EFTA. As a result, they argue, Johnson's claims fail as a matter of law. Again, the court disagrees.

#### a. Johnson's allegations and their factual basis.

In his complaint, Johnson alleges that, as a condition for obtaining the loan, he was required to sign a waiver of his right to stop payment of any "pre-authorized electronic fund transfers" out of an account created for him by the defendants. In response to these allegations, the defendants contend that the loan to Johnson "did not involve a pre-authorized electronic fund transfer" as defined by the EFTA. Noting that the Act defines these transfers as ones that are "authorized in advance to recur at substantially regular intervals," *see* 15 U.S.C. § 1693a (1994), the defendants distinguish the transfer arrangement at issue here since the loan only authorized the defendants to "effect a debit entry" of "one payment" from Johnson's account. As a result, the defendants contend, this transfer cannot "recur at substantially regular intervals."

Johnson responds by pointing out that his loan is very likely to "roll over" and, thus, "it is completely possible, and even likely, that a pre-authorized debt in this case would 'recur at substantially regular intervals.'" However, the defendants point out that even if Johnson re-financed his old loan through a new roll over, he would have to enter into a new loan agreement. Thus, even though this new agreement (like the old one) would authorize the defendants to "effect a debit entry" of "one payment" from Johnson's account, the defendants would still "make only one electronic funds transfer per note" and thus remain in technical compliance with the EFTA since the transfers, while possibly

"recur[ring] at substantially regular intervals," would occur on different notes.

b. This literal interpretation of the statute would offend the law's primary purpose.

▮ Were the court to adopt the defendant's literal interpretation of the term "pre-authorized electronic fund transfer," the EFTA's "primary objective," which "is the provision of individual consumer rights," would be undermined. *See* 15 U.S.C. § 1693(b) (1994). Thus, while Johnson literally only authorizes the defendants to "effect a debit entry" of "one payment" from his account every time he rolls over his loan, the "pre-authorized electronic fund transfer" arguably "recur[s] at substantially regular intervals" as a direct result. Therefore, the court will deny the defendants' motion to dismiss as it relates to Johnson's claims under the EFTA.

3. Johnson's claims for a declaratory judgment.

Finally, in his complaint, Johnson asks this court to declare that both the rate of interest on his loan and the arbitration clause contained within the loan agreement are unconscionable. The defendants have sought the dismissal of these claims as well.

a. The rate of interest.

▮ With respect to the first claim, the defendants argue that because unconscionability is a defense to a contract action, there is no actual controversy before the court in which to issue a declaratory judgment since Johnson has failed to allege that anyone has attempted enforce the loan agreement. *See* 28 U.S.C. § 2201 (1994) (requiring the existence of an "actual controversy" before the court can exercise jurisdiction). There is little merit to this argument since, as the Tenth Circuit has observed, "a party to a contract is not compelled to wait until he has committed an act which the other party asserts will constitute breach but may [instead] seek relief by declaratory judgment and have the controversy adjudicated in order ... [to] avoid the risk of damage or other untoward consequence[s]." *See Keener Oil & Gas Co. v. Consolidated Gas Util. Corp.*, 190 F.2d 985, 989 (10th Cir.1951). In other words, the court should not require Johnson to breach his loan agreement in order to become the subject of a lawsuit so that he can then raise the defense of unconscionability.

▮ Perhaps in anticipation of this conclusion, the defendants argue in the alternative that the annual percentage rate paid by Johnson is not unconscionable since it is "entirely legal." On this point, the defendants note that (1) the rate was disclosed to Johnson, (2) he was aware of it when he signed the agreement, and (3) he had the opportunity to reject the terms of the loan but did not. Given this opportunity to "take it or leave it," the defendants claim that the terms of the loan agreement are not "so one-sided as to be oppressive." *See Graham*, 565 A.2d at 912. This argument completely misinterprets the *Graham* decision.

In *Graham*, the Delaware Supreme Court *specifically* stated that "[a] contract of adhesion [like the loan agreement here] may be declared unenforceable, in whole or in part, if its terms are unconscionable within the meaning of ... [Section] 2–302" of Title 6 of the Delaware Code. *Id.* As the *Graham* court explained, while "mere disparity between the bargaining power of parties to a contract will not support a finding of unconscionability," when a "party with superior bargaining power use[s] it to take unfair advantage of his weaker counterpart" by providing terms that were "so one-sided as to be oppressive," then a finding of unconscionability is warranted. *Id.*

Thus, even though the State of Delaware does not place a limit on the amount of interest or other charges a bank may charge, *see* Del.Code Ann. tit. 5, § 962 (1998), the court cannot conclude (given the present record) that (1) the defendants

did not abuse their superior bargaining power by (2) drafting terms which were "so one-sided as to be oppressive" since Johnson has alleged that he was charged a rather exorbitant rate of interest—specifically, 917 percent per annum.

### b. The arbitration clause.

 As far as Johnson's second claim for a declaratory judgment is concerned, the arbitration clause contained within the loan agreement was not "so one-sided" as to be unconscionable. As the *Graham* court stated,

> while it is true that the [agreement] was presented to the [plaintiffs] on a 'take-it or leave-it' basis, we do not believe that the inclusion of an arbitration clause unfairly favored [the defendant]. If the arbitration mechanism established by the policy had been unfairly structured, a finding of unconscionability might be appropriate. However, since both parties have equal input into the selection of the arbitrators and since both parties are bound by the result, we find no inherent unfairness in the clause.

*Id.* at 912–13.

The court reaches the same conclusion here. While the arbitration clause might be unenforceable with respect to Johnson's TILA claims, the clause itself is not in any way oppressive. It does not unfairly structure the arbitration process by affording the defendants any procedural advantages in the arbitral forum. *See* Note 5 *infra.* Because this claim fails as a matter of law, the court will dismiss it.

## IV. CONCLUSION.

Because compelling arbitration would effectively strip both the TILA and EFTA of their sting, the court will deny the defendants' motion to compel in order to ensure that creditors have a "meaningful incentive to comply" with the disclosure requirements of these Acts. In addition, the court will deny the defendants' motion to dismiss as it relates to Johnson's claims under the TILA and EFTA as well as for a declara-tory judgment on whether the rate of interest on his loan was unconscionable. However, the court will grant the motion to dismiss as it relates to Johnson's claim that the arbitration clause is unconscionable since the terms of this agreement were not so one-sided as to be oppressive. The court will issue an order to this effect in conjunction with this opinion.