786 A.2d 886 (2001)
346 N.J. Super. 42
Robert E. GRAS, Sr. and Evelyn L. Gras, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
ASSOCIATES FIRST CAPITAL CORP., Associates Corp. of North America, Associates Financial Services Co., Inc., and Union Security Life Insurance Co., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 2001.
Decided December 20, 2001.
*887 Donna Siegel Moffa, Cherry Hill, argued the cause for appellants (Rodriguez & Richards, attorneys; Lisa J. Rodriguez and Ms. Moffa, on the brief).
Mark S. Melodia, Princeton, argued the cause for respondents Associates First Capital Corp., Associates Corp. of North America and Associates Financial Services Co., Inc. (Reed Smith Shaw & McClay, attorneys; Mr. Melodia, on the brief).
B. John Pendleton, Jr., Newark, argued the cause for respondent Union Security Life Insurance Co. (McCarter & English, attorneys; Mr. Pendleton, Jr., of counsel; Farrokh Jhabvala and Joanne M.F. Wilcomes, on the brief).
Before Judges SKILLMAN, WALLACE, JR., and CARCHMAN.
The opinion of the court was delivered by CARCHMAN, J.A.D.
Plaintiffs Robert E. Gras, Sr. and Evelyn L. Gras entered into a series of five secured loan transactions with defendants Associates First Capital Corp., Associates Corp. of North America, and Associates Financial Services Co., Inc. (collectively "Associates"). Each loan transaction was accompanied by the purchase of credit life insurance provided by defendant Union Security Life Insurance Co. (Union). The loan documents further included an agreement whereby plaintiffs consented to arbitrate any dispute or claim in connection with the loans, including within its terms "any claim or dispute based on a federal or state statute." Finally, the arbitration agreement prohibited plaintiffs from pursuing a class action in arbitration.
Plaintiffs brought an action in the Law Division alleging, among other claims, that the credit life insurance provisions of the loan agreements violated the Consumer Fraud Act, N.J.S.A. 56:8-1 to -106. Defendants filed a Demand for Arbitration with the American Arbitration Association (AAA), plaintiffs moved to stay the arbitration, and defendants cross-moved for a stay pending arbitration. The motion judge granted defendants' motion and dismissed *888 plaintiffs' complaint. Plaintiffs appealed, and we stayed the arbitration pending appeal.
We reject plaintiffs' claim on appeal that the arbitration agreement is void because it contravenes public policy by precluding class actions and, if not void, the agreement cannot be enforced since plaintiffs did not knowingly waive their rights to pursue such action. We conclude that the arbitration agreement is valid even though it does preclude class actions as plaintiffs can maintain their statutory claims in the arbitration proceeding. We also conclude that the agreement adequately notifies plaintiffs as to the limitation of their rights. We affirm.

I.
Over a period of four years, plaintiffs secured five loans from Associates and, as part of each loan transaction, purchased credit life insurance from Union. Each loan was used to pay the prior loan, and the principal amount of each loan ranged from approximately $27,000 to $68,000. The credit life premiums ranged from $2,948.46 to $3,585. Although the record on appeal does not reflect signatures as to each insurance agreement, plaintiffs were required to acknowledge purchase of the insurance in each instance.
Each loan agreement was accompanied by a separate arbitration agreement. Each agreement was separately executed by plaintiffs and carried a legend at the beginning of the agreement stating:
READ THIS ARBITRATION AGREEMENT CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A COURT ACTION.
The arbitration agreement also described the costs of arbitration, the selection of arbitrators, the method of initiating arbitration, the location of the arbitration, and the enforcement of the arbitration decision.
The agreement specifically described the disputes covered by arbitration and stated in pertinent part:
[t]his agreement applies to all claims and disputes between [plaintiffs] and [Associates]. This includes, without limitation, all claims and disputes arising out of, in connection with, or relating to:
 your loan with us today;
 any previous loan from us and any previous retail installment sales contract or loan assigned to us;
 all the documents relating to this or any previous loan or retail installment sales contract;
 any insurance purchased in connection with this or any previous loan or retail installment sales contract;
....
 any claim or dispute based on a federal or state statute;
[emphasis added.]
Finally, the agreement prohibited plaintiffs from bringing a class action in the arbitration forum and reiterated the original capitalized legend previously described.
While they signed these arbitration agreements, plaintiffs allege that they never negotiated or discussed them with defendants. They further allege that these agreements were presented to them as part of a "stack" of closing papers. Defendants characterized those documents as the same closing documents signed in plaintiffs' previous loan transactions.

II.
Plaintiffs argue that the arbitration agreements they signed in connection with their loans from Associates are contracts of adhesion and, as such, are unconscionable as they contravene public policy.
*889 We first restate the basic principles applicable to the issues presented here. An arbitration clause or agreement in a contract involving interstate commerce is subject to the Federal Arbitration Act (FAA). See 9 U.S.C.A. § 1 to 16; Perry v. Thomas, 482 U.S. 483, 489, 107 S.Ct. 2520, 2525, 96 L.Ed.2d 426, 435 (1987). Arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902, 909 (1996).
We first address the issue of contracts of adhesion, which have been widely addressed by our courts. A contract of adhesion is defined as "[a] contract where one party ... must accept or reject the contract[.]" Rudbart v. North Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353, 605 A.2d 681, cert. denied sub nom. First Fid. Bank v. Rudbart, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992) (quoting Vasquez v. Glassboro Serv. Ass'n, Inc., 83 N.J. 86, 104, 415 A.2d 1156 (1980)). "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the `adhering' party to negotiate except perhaps on a few particulars." Ibid. (citations omitted). Significantly, the mere fact that a contract is adhesive does not render it unenforceable; that issue must be determined as a matter of policy. Ibid.
Applying these standards here, we have little reservation in concluding that these were contracts of adhesion; however, as we have noted, the finding of an adhesive contract is not dispositive of the issue of enforceability. Such a finding "is the beginning, not the end, of the inquiry[.]" Id. at 354, 415 A.2d 1156. Rudbart instructs us that the appropriate analysis requires a consideration of the subject matter of the contract, the relative bargaining powers of each party, the degree of economic compulsion motivating the adhering party, and the public interests affected by the contract. Id. at 356, 605 A.2d 681. We have applied these factors in our review of various agreements to arbitrate. See, e.g., Young v. Prudential Ins. Co. of Am., 297 N.J.Super. 605, 619, 688 A.2d 1069 (App.Div.), certif. denied, 149 N.J. 408, 694 A.2d 193 (1997) (enforcing an NASD arbitration provision and requiring plaintiff to proceed in arbitration on a claim alleging violation of the Law Against Discrimination (LAD)); Allgor v. Travelers Ins. Co., 280 N.J.Super. 254, 260, 654 A.2d 1375 (App.Div.1995) (holding that an agreement to arbitrate an underinsured motorist (UIM) claim was not invalid merely because it was a contract of adhesion as the arbitration provision advanced a public policy of providing an appropriate forum for disposing of UIM claims).
Plaintiffs focus their challenge on the arbitration agreement's preclusion of their right to proceed as a class and claim that such provision violates New Jersey's policy of protecting consumers. We look first to the body of federal decisions where the majority of federal courts addressing this issue have taken a different view where the particular statute in issue fails to provide for such right.
In Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 23, 111 S.Ct. 1647, 1650, 114 L.Ed.2d 26, 35 (1991), the Supreme Court considered the issue of whether a claim under the Age Discrimination in Employment Act (ADEA) can be subjected to compulsory arbitration pursuant to an arbitration *890 agreement in a securities registration application. In answering the question in the affirmative, the Court first recognized that statutory claims may be the subject of an arbitration agreement, and stated that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Id. at 26, 111 S.Ct. at 1652, 114 L.Ed.2d at 37 (quoting Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444, 456 (1985)). The Court then concluded that the party, having made the agreement to arbitrate, should be held to it unless Congress has evinced an intention to preclude waiver of judicial remedies for the statutory rights at issue. "If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an `inherent conflict' between arbitration and the ADEA's underlying purpose." Ibid.
While plaintiff in Gilmer conceded that there was nothing in the text or legislative history that specifically precluded arbitration, he argued that arbitration of ADEA claims would be inconsistent with the statutory framework and purposes of the ADEA. Id. at 26-27, 111 S.Ct. at 1652-53, 114 L.Ed.2d at 37. Significantly, the Court rejected the argument that the arbitration procedures cannot further the purposes of the ADEA because they do not provide for class actions. Id. at 32, 111 S.Ct. at 1655, 114 L.Ed.2d at 41. In eschewing this argument, the Court observed that "the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred." Ibid. (quoting Nicholson v. CPC Int'l Inc., 877 F.2d 221, 241 (3d Cir.1989) (Becker, J., dissenting)).
In Sagal v. First USA Bank, 69 F.Supp.2d 627, 632 (D.Del.1999), aff'd, 254 F.3d 1078 (3d Cir.2001), the court compelled a plaintiff who brought a class action against a banking association to arbitrate his Truth in Lending Act (TILA) claim in accordance with an arbitration agreement. Plaintiff argued that mandatory arbitration would preclude his right to bring a class action. He asserted that Congress perceived class actions as a means to enforce TILA because claims under Act are often too small to litigate. The court, while acknowledging that Congress recognized class actions are a useful tool to enforce one's rights, noted that TILA neither provides for a statutory right to bring such an action nor relies exclusively on class actions as an enforcement mechanism. Id. at 631-32. The court concluded that "[b]ecause Congress has not provided for a statutory right to pursue class actions under TILA, and because there are alternative means to bring suit thereunder, this court does not find that the TILA amounts to a `congressional command' to preserve class action suits at the expense of the FAA." Ibid.
In Johnson v. West Suburban Bank, 225 F.3d 366, 368 (3d Cir.2000), cert. denied, Johnson v. Tele-Cash, Inc., 531 U.S. 1145, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001), the court addressed the issue of whether claims under TILA and the Electronic Fund Transfer Act (EFTA) may be arbitrated under an arbitration clause when a plaintiff seeks to bring a claim on behalf of multiple plaintiffs. The Third Circuit reversed a district court decision which had concluded that "an inherent conflict existed because `without the possibility of class action liability looming on a creditor's horizon, there is a very real possibility that these entities will not voluntarily comply with the Truth in Lending regulations.'" Id. at 371 (quoting Johnson v. Tele-Cash, Inc., 82 F.Supp.2d 264, 271 (D.Del.1999)).
*891 After reviewing the text of the statute and the legislative history, the court found no inherent conflict and determined that the right to proceed as a class action is a procedural matter arising from the Federal Rules of Civil Procedure. Id. at 371-78. In its analysis of whether plaintiff could vindicate his substantive rights in the arbitration forum, the court compared the ADEA and TILA, and noted that the ADEA actually provides for collective litigation, while TILA did not. Id. at 377. Noting that the Supreme Court in Gilmer held that the ADEA did not preclude arbitration notwithstanding the unavailability of the class action remedy, the Third Circuit stated that "[e]ven if we were to conclude that the statute implies a right to proceed as a member of a class, Gilmer indicates that rights of this nature are waivable so long as the rights the statute was designed to protect may be vindicated by other means." Id. at 377-78.
Most recently, in Randolph v. Green Tree Fin. Corp., 244 F.3d 814 (11th Cir. 2001), the Eleventh Circuit held that a contractual provision to arbitrate TILA claims was enforceable despite the fact that it precludes plaintiff from utilizing class action procedures in vindicating statutory rights under TILA. The court, citing Johnson, acknowledged that while TILA specifically contemplates class actions, the legislative history does not indicate that Congress intended to confer upon individuals a non-waivable right to pursue a class action. Id. at 817 (quoting Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1338 (11th Cir.2000)).
Plaintiffs focus on cases where courts have found arbitration agreements precluding a class action to be unenforceable because of their detrimental impact on consumers' rights. These cases are not persuasive. In Lozada v. Dale Baker Oldsmobile, Inc., 91 F.Supp.2d 1087, 1100-03, (W.D.Mich.2000), the district court held that enforcement of an arbitration agreement under Michigan's consumer fraud act would be both procedurally and substantively unconscionable. In its analysis, however, the court relied on the reasoning of the district court in Johnson, supra, 82 F.Supp.2d 264, which was later reversed by the Third Circuit, Johnson, supra, 225 F.3d 366. See also Powertel, Inc. v. Bexley, 743 So. 2d 570, 574, 576-77 (Fla.Dist. Ct.App.1999), review denied, 763 So.2d 1044 (Fla.2000) (holding that the arbitration provision barring a class action against defendant under the Florida Deceptive and Unfair Trade Practices Act was both procedurally and substantively unconscionable and implying that such class actions were explicitly permitted by the statute).
We now focus our attention on whether an inherent conflict exists between arbitration and the underlying purpose of New Jersey's Consumer Fraud Act (CFA). In Caruso v. Ravenswood Developers, Inc., 337 N.J.Super. 499, 508, 767 A.2d 979 (App.Div.2001), we held that consumer fraud and RICO claims were subject to arbitration. In Caruso, plaintiffs argued that the remedial purposes of consumer fraud and RICO claims are incompatible with arbitration, id. at 504, 767 A.2d 979; however, we concluded that a "review of the text and history of the Consumer Fraud Act ... provides no support for the position promoted by plaintiffs that neither statutory claim is amenable to arbitration. Indeed, this court has held that claims arising under the Consumer Fraud Act may be heard and resolved through arbitration." Id. at 505, 767 A.2d 979 (citing Cybul v. Atrium Palace Syndicate, 272 N.J.Super. 330, 335, 639 A.2d 1146 (App.Div.), *892 certif. denied, 137 N.J. 311, 645 A.2d 140 (1994)).
There is no inherent conflict between arbitration and the underlying purposes of the CFA. First, as with TILA, the CFA does not specifically create a private right to bring a class action.[1] Additionally, plaintiffs can vindicate their statutory rights in the arbitration forum. Arbitration rules support this conclusion. See AAA Arbitration Rule R 45(a) (providing that the "arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties...."); Rule R-45(c) (providing that "[i]n the final award, the arbitrator shall assess the fees, expenses, and compensation provided in [Rules] R-51 [(administrative fees)], R-52 [(expenses) ], and R-53 [ (neutral arbitrator's compensation) ]. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate."); Rule R-45(d) (providing that the arbitrator's award may include interest and attorney's fees if they are requested or authorized by law or agreement).
Finally, the CFA provides a successful plaintiff with other remedies that can also be granted by the arbitrator. N.J.S.A. 56:8-19 provides:
In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.
Our Supreme Court has stated that the three main purposes of the CFA are:
to compensate the victim for his or her actual loss; to punish the wrongdoer through the award of treble damages, Roberts v. Cowgill, 316 N.J.Super. 33, 45, 719 A.2d 668 (App.Div.1998); and, by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. Silva v. Autos of Amboy, Inc., 267 N.J.Super. 546, 555, 632 A.2d 291 (App.Div.1993).
[Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139, 741 A.2d 591 (1999).]
All three of these objectives can be vindicated in the arbitration forum and a successful plaintiff can achieve all statutory remedies in the same forum.
In addressing the issues before us, two significant public policies must be harmonized. Plaintiffs identify the first and correctly assert that the policy behind the CFA is to "root out consumer fraud." Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264, 696 A.2d 546 (1997). However, that policy must be balanced by a competing and compelling public policy favoring arbitration as a means of dispute resolution and requiring liberal construction of contracts in favor of arbitration. Alamo Rent A Car, Inc. v. Galarza, 306 N.J.Super. 384, 389, 703 A.2d 961 (App.Div.1997) (citing Marchak v. Claridge *893 Commons, Inc., 134 N.J. 275, 281, 633 A.2d 531 (1993)).
On balance, even if we consider the policies in equipoise, we must consider that here the parties have agreed to permit the issues to be resolved in the arbitration forum. We recognize that the parties were in distinctly different bargaining positions. We are less certain of the economic compulsion that caused plaintiffs to recast each loan with a new loan over a short period of time. Nevertheless, even assuming that these factors ultimately favor plaintiffs' position, the absence of a legislative mandate or overriding public policy in favor of class actions leads us to conclude that the arbitration provision in question here is enforceable.

III.
Plaintiffs also claim that the agreements are unenforceable because plaintiffs did not knowingly waive their statutory rights. Waiver of statutory rights provisions in arbitration agreements must be clear and explicit. Grasser v. United HealthCare Corp., 343 N.J.Super. 241, 247, 778 A.2d 521 (App.Div.2001). We have rejected statutory waiver provisions where the language of such waiver simply made reference to a waiver of any claims. See Alamo, supra, 306 N.J.Super. at 392-94, 703 A.2d 961 (holding that a reference to "any claim" did not serve as a waiver of plaintiff's right to proceed on an LAD claim in the courts). In Alamo, we did comment that language describing "any dispute" was preferable but cautioned parties regarding appropriate language for waiver of federal and state remedies.
The "any dispute" language is the very least an employer needs to utilize in order to guarantee arbitration of all disputes. The better course would be the use of language reflecting that the employee, in fact, knows that other options such as federal and state administrative remedies and judicial remedies exist; that the employee also knows that by signing the contract, those remedies are forever precluded; and that, regardless of the nature of the employee's complaint, he or she knows that it can only be resolved by arbitration.

[Id. at 394, 703 A.2d 961.]
In Quigley v. KPMG Peat Marwick, LLP, 330 N.J.Super. 252, 749 A.2d 405 (App.Div.), certif. denied, 165 N.J. 527, 760 A.2d 781 (2000), we addressed the sufficiency of the language of an agreement to arbitrate in an employment contract. The employment contract stated that:
Any claim or controversy between the parties arising out of or relating to this Agreement or the breach thereof, or in any way related to the terms and conditions of the employment of [plaintiff] by [defendant], shall be settled by arbitration under the laws of the state in which [plaintiff's] office is located.

[Id. at 257, 749 A.2d 405.]
We recognized that "`[a] clause depriving a citizen of access to the courts should clearly state its purpose,' especially where the choice is to arbitrate disputes rather than litigate them," id. at 271, 749 A.2d 405 (quoting Marchak, supra, 134 N.J. at 282, 633 A.2d 531), and noted that "a court should construe ambiguous language against the interest of the party that drafted it." Ibid. (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76, 87 (1995)). We held that the arbitration language was ambiguous and not broad enough to encompass plaintiff's claim of a LAD violation. Id. at 270-72, 749 A.2d 405.
*894 Recently, in Garfinkel v. Morristown Obstetrics & Gynecology Assocs., 168 N.J. 124, 127, 773 A.2d 665 (2001), the Court held that an employment agreement's arbitration clause was insufficient to constitute a waiver of the plaintiff's remedies under LAD. The arbitration agreement at issue stated:
any controversy or claim arising out of, or relating to, this Agreement or the breach thereof, shall be settled by arbitration in Morristown, New Jersey, in accordance with the rules then obtaining of the American Arbitration Association, and judgement [sic] upon any reward [sic] rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof.
[Id. at 128, 773 A.2d 665.]
In finding the language inadequate to constitute a waiver, the Court approved the reasoning in both Alamo and Quigley, id. at 132-136, 773 A.2d 665, and observed that it would not assume that employees intended to waive those rights unless the agreements "so provide in unambiguous terms." Id. at 135, 773 A.2d 665. An agreement need not specifically refer to the LAD or list every imaginable statute, however, it should provide that "the employee agrees to arbitrate all statutory claims arising out of the employment relationship or its termination. It should also reflect the employee's general understanding of the type of claims included in the waiver...." Ibid.
In Young, supra, 297 N.J.Super. at 613, 688 A.2d 1069, the arbitration agreement at issue read as follows:
THE FOLLOWING SHOULD BE READ VERY CAREFULLY BY THE APPLICANT.
....
I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register,....
We noted the large print of the cautionary language and the fact that plaintiff had signed the agreement. Id. at 613, 688 A.2d 1069. Although plaintiff contended that defendant never alerted him to the arbitration provision, no such obligation exists where the provision is not hidden. Id. at 619, 688 A.2d 1069. "Failing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading." Ibid. (citing Berman v. Gurwicz, 178 N.J.Super. 611, 617-18, 429 A.2d 1084 (Ch.Div.1981)). We determined that plaintiff had in fact knowingly waived his statutory rights.
Most recently, in Grasser, supra, 343 N.J.Super. at 250, 778 A.2d 521, we applied the specificity of waiver rule mandated by Alamo, Quigley, and Garfinkel, and concluded that the language of the arbitration agreement was as nonspecific as the language in these three cases. In Grasser, the arbitration provision did not mention arbitration of LAD claims or arbitration under comparable federal anti-discrimination laws. Ibid. Additionally, the waiver did not "provide that the employee agree[d] to arbitrate all statutory claims arising out of the employment relationship or its termination." Id. at 251, 778 A.2d 521 (quoting Garfinkel, supra, 168 N.J. at 135, 773 A.2d 665).
The holdings in these cases provide ample authority for our conclusion. The arbitration agreements signed by plaintiffs here are specific enough to inform plaintiffs that they were waiving their statutory rights to litigation in a court. First, the *895 agreements in question state at the top of the page in uppercase letters:
READ THIS ARBITRATION AGREEMENT CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A COURT ACTION.
Additionally, this same caution is repeated at the end of the agreement, immediately before the signatures of both plaintiffs. The agreement is explicit about which disputes are covered. Most relevant, the agreement addresses disputes based on a federal or state statute, as well as "insurance purchased in connection" with these loans, and specifically waives any right to proceed as a class against defendants.
While this agreement does not name each state and federal statute the agreement covers, it does employ "language reflecting that the [plaintiff], in fact, knows that other options such as ... judicial remedies exist...." Alamo, supra, 306 N.J.Super. at 394, 703 A.2d 961.
Finally, we reject any claim that plaintiffs did not know what they were signing. The documents in question were presented to them, albeit, "in a stack of documents"; however, that standing alone provides no basis for refusing enforcement.
Affirmed.
NOTES
[1] The CFA does permit public officials to sue for a class of victims. N.J.S.A. 56:8-8. Additionally, the Supreme Court has recognized the right to bring a private class action under the CFA. Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 225, 294 A.2d 7 (1972). In Riley, the Court stated that "private class actions must be accepted if the objectives [of the CFA] are to be realized ...." Id. at 226, 294 A.2d 7 (citing Kugler v. Romain, 58 N.J. 522, 540, 279 A.2d 640 (1971)).