DELTA FUNDING CORPORATION
Plaintiff,

v.

**Alberta HARRIS Defendant.**

**No. CIV.A. 02–4080JCL.**

United States District Court,
D. New Jersey.

March 1, 2004.

Martin C. Bryce, Ballard Spahr Andrews & Ingersoll, LLP, Voorhees, NJ, for Plaintiff.

Madeline Levine Houston, Houston & Totaro, Bloomfield, NJ, for Defendant.

### MEMORANDUM AND ORDER

LIFLAND, District Judge.

This matter concerns the validity and enforceability of an arbitration agreement, which encompasses certain statutory claims arising from the issuance of a mortgage loan. Plaintiff Delta Funding Corporation ("Delta") filed a complaint in the nature of a petition to compel arbitration and enjoin the prosecution of state court counterclaims and a third-party complaint brought by Defendant Alberta Harris ("Harris"). Harris moves for summary judgment dismissing Delta's petition, and Delta cross-moves to compel arbitration. For the reasons outlined below, Harris's motion for summary judgment will be denied and Delta's motion to compel arbitration will be granted.

## I.

### FACTS AND PROCEDURAL BACKGROUND

In December 1999, Harris entered into a credit transaction with Delta, whereby she obtained a mortgage loan in the amount of $37,300. Delta is a sub-prime lender, meaning that it focuses on lending to individuals who generally have impaired or limited credit profiles, or higher debt-to-income ratios but with substantial equity in their homes. The loan is currently the subject of a pending foreclosure action in the Su-

perior Court of New Jersey, Chancery Division, Essex County, which was instituted by Wells Fargo Bank, Minnesota N.A. ("Wells Fargo"), as trustee for the current holder of Harris's mortgage. In response, Harris filed an answer, counterclaim, and third-party complaint, naming Delta as a third-party defendant. Harris counterclaimed under, *inter alia,* the New Jersey Consumer Fraud Act, alleging that the loan in question was an equity-skimming loan (*i.e.,* a loan made knowing that the borrower could not pay it back, thereby allowing the lender to take the borrower's house in payment), which was unconscionable in its entirety, that the entire loan should be declared void and unenforceable, and that treble damages should be assessed together with attorneys' fees.

Pursuant to the terms of an arbitration agreement executed in connection with the mortgage loan (hereinafter, "Arbitration Agreement"), Delta then filed the present petition to compel arbitration of Harris's state court claims. The foreclosure has been stayed, along with the counterclaim and third-party claims, by order of the Chancery Division pending a decision by this Court on the complaint to compel arbitration. Harris challenges the agreement to arbitrate and its specific components, alleging that it contains grossly unfair contractual terms, contravenes standards in the public interest, and unreasonably burdens the effective enforcement of her statutory rights.

## II.

## ANALYSIS

### A. Standard of Review

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56. Rule 56(e) requires that when a motion for summary judgment is made, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.; see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976).

As discussed below, the sole question presented in this matter is whether the Arbitration Agreement is enforceable. As there is no dispute over any material facts, this case is ripe for disposition as a matter of law.

### B. Validity of Arbitration Agreement

An arbitration agreement in a contract involving interstate commerce is subject to the Federal Arbitration Act (the "FAA"). *See* 9 U.S.C. §§ 1–16; *Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987).[1] Congress enacted

---

1. The Arbitration Agreement states that it was made pursuant to a transaction involving interstate commerce and was to be governed by the Federal Arbitration Act:

    ***Federal Arbitration Act and Appeals.*** This Agreement is made pursuant to a transaction involving interstate commerce, and, notwithstanding any choice of law clause

the FAA in 1925 in response to the traditional judicial hostility to the enforcement of arbitration agreements. *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir.2003). The FAA makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Before compelling an unwilling party to arbitrate, the FAA thus requires the court to engage in a limited review to ensure that the dispute is arbitrable: viz., that the agreement to arbitrate is valid and that the specific dispute falls within the substantive scope of that agreement. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626–28, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *PaineWebber, Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir.1990). Harris does not dispute that she is a signatory to a written arbitration agreement, which purports to preclude her from pursuing her specific claims in a judicial forum. The precise issue here, then, is whether that agreement to arbitrate is valid and enforceable.

With the enactment of the FAA, "Congress precluded states from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). The enactment establishes the strong federal policy in favor of the resolution of disputes through arbitration. *Alexander*, 341 F.3d at 263. "Thus, federal law presumptively favors the enforcement of arbitration

agreements." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir.1999). Yet, notwithstanding the "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), such agreements are not automatically enforceable; generally applicable contract defenses, such as the doctrine of unconscionability, may be applied to invalidate arbitration agreements without contravening the FAA. *Alexander*, 341 F.3d at 264 (citing *Doctor's Assocs.*, 517 U.S. at 687, 116 S.Ct. 1652); *Harris*, 183 F.3d at 179 (same). It follows that courts must "remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Alexander*, 341 F.3d at 264 (quoting *Mitsubishi*, 473 U.S. at 624, 105 S.Ct. 3346). "Although possibly relevant, considerations of public policy and the loss of state statutory rights are not dispositive in the unconscionability inquiry. The generally applicable standards of this contractual doctrine continue to dictate the result of any analysis." *Id.*

The party opposing arbitration bears the burden of proving that the claims at issue are not subject to arbitration. *Green Tree Fin. Corp.Ala. v. Randolph*, 531 U.S. 79, 91–92, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). A federal court must generally look to the relevant state law on the formation of contracts to determine whether there is a valid arbitration agreement under the FAA. *Alexander*, 341 F.3d at 264; *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir.2002). Accordingly, the

which may be contained in any other documents which are part of the Credit Transaction, shall be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. Section 1 et. seq.

Arbitration Agreement at 3. As there is no contention otherwise, the FAA applies to this action.

Court applies general contract principles of New Jersey law in determining whether the Arbitration Agreement is enforceable.

As a threshold matter, it is worth noting that the New Jersey legislature codified its endorsement of arbitration agreements, N.J.S.A. 2A:24–1, et seq., and that New Jersey courts have favored arbitration as a means of resolving disputes. *See Martindale v. Sandvik, Inc.,* 173 N.J. 76, 84–85, 800 A.2d 872 (2002); *Garfinkel v. Morristown Obstetrics & Gynecology Assocs.,* 168 N.J. 124, 131, 773 A.2d 665 (2001) (noting favored status accorded to arbitration, but stating that favored status is not without limits); *Marchak v. Claridge Commons, Inc.,* 134 N.J. 275, 281, 633 A.2d 531 (1993) (stating that "arbitration is a favored form of relief" and that "arbitrators function with the support, encouragement, and enforcement power of the State"); *Alamo Rent A Car, Inc. v. Galarza,* 306 N.J.Super. 384, 389, 703 A.2d 961 (App.Div.1997) (recognizing "strong public policy in our state favoring arbitration as a means of dispute resolution and requiring a liberal construction of contracts in favor of arbitration"). In considering whether the agreement to arbitrate is enforceable, the Court is thus mindful of the strong national and state policies in favoring arbitration.

■ Harris argues that the Arbitration Agreement is an unenforceable contract of adhesion. A contract of adhesion is defined as "[a] contract where one party ... must accept or reject the contract [.]" *Gras v. Assocs. First Capital Corp.,* 346 N.J.Super. 42, 48, 786 A.2d 886 (App.Div. 2001) (quoting *Rudbart v. North Jersey Dist. Water Supply Comm'n,* 127 N.J. 344, 353, 605 A.2d 681, *cert. denied, First Fid. Bank v. Rudbart,* 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992)). "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." *Id.* (citations omitted). Applying this standard here, the Court concludes that the Arbitration Agreement constitutes a contract of adhesion. *See id.* (holding loan documents, which included arbitration clause, to be contracts of adhesion). Given the disparity in bargaining power between Delta, a sophisticated lending institution, and Harris, a low-income, elderly householder, there is nothing in the record suggesting that Harris had a meaningful opportunity to negotiate the terms of the agreement.

■ However, the mere fact that a contract is adhesive does not render it unenforceable-such a finding "is the beginning, not the end, of the inquiry." *Id.* (quoting *Rudbart,* 127 N.J. at 354, 605 A.2d 681). Indeed, the Third Circuit has held that "inequality in bargaining power, alone, is not a valid basis upon which to invalidate an arbitration agreement." *Harris,* 183 F.3d at 183. In determining whether to enforce the terms of an adhesive contract, courts must look not only to the standardized nature of the contract, "but also to the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract." *Martindale,* 173 N.J. at 90, 800 A.2d 872 (citations omitted). This is a fact-sensitive analysis and must therefore be determined on a case-by-case basis. *Id.* Put differently, an adhesive contract will be unenforceable only if it consists of "grossly unfair contractual obligations," *Shell Oil Co. v. Marinello,* 63 N.J. 402, 408, 307 A.2d 598 (1973), or contains terms that are "oppressive or unconscionable," *Martindale,* 173 N.J. at 91, 800 A.2d 872. Other jurisdictions also require an adhesive contract to be substantively uncon-

scionable-containing grossly unfair terms-in order to be deemed unenforceable. .*See, e.g., Alexander,* 341 F.3d at 265 (recognizing adhesion contract not unenforceable under territorial law unless party challenging contract establishes substantive unconscionability); *Circuit City Stores, Inc. v. Najd,* 294 F.3d 1104, 1108 (9th Cir.2002) (noting that under California law a contract is unenforceable if it is both procedurally and substantively unconscionable); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1154 (5th Cir.1992) ("Adhesion contracts are not automatically void. Instead, the party seeking to avoid the contract generally must show that it is unconscionable."), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993). Whether the Arbitration Agreement is an unenforceable contract of adhesion thus depends on whether it contains terms that are oppressive or unconscionable.

Harris emphasizes that the subject matter of the contract at issue is a non-purchase-money loan, secured by a mortgage on the home of a senior minority person of low income. She argues that the sub-prime lending market has been a matter of public concern because some lenders engage in improper practices, *i.e.,* targeting unsophisticated, low-income homeowners and "skimming" equity from the neighborhoods. This may be true, but the ultimate question is the validity of the specific arbitration agreement in question. That some sub-prime lenders act in a predatory fashion is an issue that may be relevant to the merits of Harris's state court claims. What is before this Court, however, is the validity of an agreement to have those claims resolved in an arbitral, rather than judicial, forum. That question requires the Court to examine the specific terms of the agreement to ensure they are not offensive to basic principles of contract law. The obvious disparity in bargaining power

between the parties in the sub-prime lending market certainly compels the Court to carefully examine the specific terms of any agreement to arbitrate, but it does not translate into a conclusion that arbitration agreements are per se void in the context of such transactions. And in light of the strong federal and state policies in favor of arbitration, there remains a presumption of enforceability, even in the present context. If this specific arbitration agreement is unenforceable, it is because it contains grossly unfair contractual terms, and not because it was made in the context of the sub-prime lending industry.

Harris also argues that there is a public interest in seeing the Consumer Fraud Act ("CFA") enforced, which includes the fighting of predatory lending. The Court agrees, but it rejects the argument that arbitration agreements necessarily undermine the enforcement of the Act and its social policy goals. Indeed, New Jersey courts that have addressed this specific issue have concluded that statutory claims arising from the CFA are amenable to arbitration. *See Caruso v. Ravenswood Developers, Inc.,* 337 N.J.Super. 499, 505, 767 A.2d 979 (App.Div.2001) (noting that "claims arising under the Consumer Fraud Act may be heard and resolved through arbitration") (citations omitted); *Gras,* 346 N.J.Super. at 52, 786 A.2d 886 (noting that there was no inherent conflict between arbitration and underlying purposes of CFA). These cases are consistent with decisions of the United States Supreme Court holding that federal statutory claims can be appropriately resolved through arbitration. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (noting that Sherman Act, Securities Exchange Act of 1934, RICO, and Securities Act of 1933 all are designed to advance important public policies, but claims under those statutes

are appropriate for arbitration); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (Securities Act of 1933); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185, (1987) (Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi Motors·Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (Sherman Act). More recently, the Supreme Court has stated that "even claims arising under a statute designed to further important social policies may be arbitrated because so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute serves its functions." *Randolph*, 531 U.S. at 90, 121 S.Ct. 513 (internal citations and quotation marks omitted).

Similarly, the Third Circuit has upheld the arbitration of claims arising under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601. *Johnson v. West Suburban Bank*, 225 F.3d 366, 378 (3d Cir.2000), *cert. denied, Johnson v. Tele–Cash, Inc.*, 531 U.S. 1145, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001). Notably, the Third Circuit opined that "when the right made available by a statute is capable of vindication in the arbitral forum, the public policy goals of that statute do not justify refusing to arbitrate." *Id.* at 374. Harris's arguments relating to the social policy goals of the CFA are therefore unavailing unless she can demonstrate that she cannot effectively vindicate her statutory rights in the arbitral forum. There is nothing inherently wrong about binding arbitration of CFA claims, even in the context of the subprime lending market.[2]

Harris offers a series of objections to particular provisions of the agreement, each of which the Court will address in turn.

### 1. Dual System

■ Harris challenges the arbitration agreement's "dual system": *i.e.*, that foreclosure remains in the court system while counterclaims based on the same facts and law must go to arbitration. The Arbitration Agreement provides that, upon the election of either party, resolution of claims will be subject to binding arbitration:

> ***Resolution of Claims:*** Any Claim shall be resolved, upon the election of you or us, by binding arbitration pursuant to this Arbitration Agreement and the applicable rules of either the American Arbitration Association ("AAA"), J.A.M.S./Endispute ("J.A.M.S.") or National Arbitration Forum ("NAF") in effect at the time the Claim is filed.

Arbitration Agreement at 2. It also explicitly applies to "third-party claims and claims based upon contract, tort, fraud and other intentional torts, constitution, statute, regulation, common law and equity." (Arbitration Agreement at 1.). However, it exempts foreclosure actions, eviction actions, all rights of self-help including collection of rents, and other similar actions from arbitration. Such actions may be brought in a judicial forum without contravening the agreement.

Harris argues that such a system grossly favors the lender and burdens the homeowner and the vindication of public interests. However, in an analogous context, the Third Circuit has recently upheld the validity of an arbitration agreement which gave one party the option to litigate

---

**2.** Harris's arguments repeatedly ignore the fact that an arbitrator's award will continue to be subject to judicial scrutiny to ensure that the arbitrator complied with the requirements of the statute. *See Gilmer*, 500 U.S. at 32 n. 4, 111 S.Ct. 1647.

arbitrable issues in court while requiring the other party to invoke arbitration. *See Harris v. Green Tree Fin. Corp.*, 183 F.3d at 181. In *Harris*, homeowners, who were the alleged victims of a fraudulent home improvement scheme orchestrated by Green Tree Financial Corporation ("Green Tree"), brought an action against the holder of a secondary mortgage and others pursuant to the Racketeer Influenced and Corrupt Organizations Act and the Pennsylvania Unfair Trade Practices and Consumer Protection Law. *Id.* at 176. The Harrises claimed that through direct marketing techniques, Green Tree recruited dozens of home improvement contractors for the purpose of obtaining high-interest rate secondary mortgage contracts (which were to be sold and assigned to Green Tree) from relatively unsophisticated, low-to-middle-income elderly homeowners. *Id.* Green Tree and the other defendants moved to compel arbitration based on an arbitration clause contained in the relevant contracts. *Id.* at 177. The Harrises argued that the arbitration clause was invalid and unenforceable because it lacked the requisite mutuality and was unconscionable, primarily due to the fact that Green Tree retained the option to litigate some issues in court. The Third Circuit disagreed, holding that it was "of no legal consequence that the arbitration clause gives Green Tree the option to litigate arbitrable issues in court, while requiring the Harrises to invoke arbitration." *Id.* at 181. The court reasoned that an "arbitration clause need not be supported by equivalent obligations." *Id.* at 180.

In this case, Harris nonetheless argues that the consequences of such a system are grossly unfair in two respects: (1) it impairs the ability of the homeowner to obtain counsel and (2) it favors the lender in terms of its ability to obtain discovery. These contentions, however, fail to adequately distance this case from the Third Circuit's precedential holding in *Harris*, especially given the similarity in factual contexts. First, as to the alleged problem in obtaining counsel, Harris presents certifications from legal services attorneys which declare that such a dual system exacerbates an already pressing problem in finding attorneys willing to take on foreclosure defense/counterclaim cases. This is allegedly due to the fact that any predatory lending case, which is already highly complex and demanding, must proceed in two forums, thus requiring the same case to be taken twice on a contingency basis. However sympathetic the Court might be to the current problem of inadequate funding and resources in the various legal services offices, and concomitantly, the difficulty experienced by such offices in providing the needed representation in predatory lending cases, these concerns do not alter the analysis concerning the validity and enforceability of the specific agreement to arbitrate in question. The Arbitration Agreement did not create this underlying problem, and any difficulty that homeowners experience in obtaining representation is the result of varied causes, only one of which is an agreement that exempts foreclosure proceedings from binding arbitration. Even assuming that this provision compounds a pre-existing problem, it is not so unreasonably favorable to Delta so as to make the agreement substantively unconscionable. This is particularly so where, as here, the party opposing arbitration has obtained the assistance of counsel.[3]

---

3. Harris also argues that the inability to obtain representation is exacerbated because there is no law in New Jersey which establishes whether or not attorneys' fees are available when the CFA is used solely as a defense. On the contrary, the Appellate Division has held that "[f]or the purposes of eligibility for payment of reasonable attorneys' fees and

Second, Harris's argument concerning discovery is misplaced. She argues that in the foreclosure action, the plaintiff, Wells Fargo, will get full discovery from her-interrogatories, documents, admissions-as a matter of right under the New Jersey discovery standard, which it will undoubtedly share with Delta in any potential arbitration. And although the same rules will apply to her, the only party left in the litigation after the counterclaims are severed will be Wells Fargo, which claims to be an assignee of Delta and to have no knowledge of anything. Harris thus contends that in the arbitration itself she will be placed at a significant disadvantage because although discovery will be limited for both parties under the relevant arbitration rules, Delta will have access to complete discovery via Wells Fargo in the foreclosure litigation, thereby rendering her ability to assert her rights illusory and ineffective. Although creative, this argument fails, for it may be reduced to an attack on the procedures of arbitration as such.

Harris fails to adequately explain why she cannot obtain the necessary discovery from Delta or any other potential non-party in the state court foreclosure action through the appropriate state court procedures. *See, e.g., R.* 4:14–7 (subpoena for taking depositions); *Cavallaro v. Jamco Property Management,* 334 N.J.Super. 557, 566, 760 A.2d 353 (App.Div.2000) (noting that one objective of discovery rule governing subpoena for taking depositions is "to provide litigants the opportunity for full discovery from non-parties"). Even assuming the truth of Harris's contention, which is purely conjectural-that Wells Fargo will turn over all relevant discovery obtained in the foreclosure action to Delta

for its use in the arbitration proceeding-she does not necessarily enter the arbitration proceedings at a significant disadvantage as compared to Delta.

What remains, then, is Harris's complaint that the arbitration rules prescribing limited discovery frustrate the vindication of her statutory rights. As this argument constitutes a generalized attack on arbitration, it must be rejected. Such attacks " 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.' " *Gilmer,* 500 U.S. at 30, 111 S.Ct. 1647 (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 481, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346. That the arbitration procedures relating to discovery are more limited is thus of no real consequence. Where, as here, there is no inherent conflict between arbitration and the relevant statutory claims, *see Caruso,* 337 N.J.Super. at 505, 767 A.2d 979; *Gras,* 346 N.J.Super. at 52, 786 A.2d 886, the strong federal and state policies in favor of arbitration defeat any claim merely premised upon the alleged unfairness of the normal procedures utilized in the arbitral forum. It is true, as Harris argues, that facially

---

costs, the Consumer Fraud Act makes no distinction between a person who raises the Act's provisions in an affirmative claim and

one who pleads it as a defense." *BJM Insulation & Constr., Inc. v. Evans,* 287 N.J.Super. 513, 516, 671 A.2d 603 (App.Div.1996).

neutral rules may operate in an unequal manner, but any risk that Harris will be unable to obtain the necessary discovery in arbitration to allow her a fair opportunity to present her claims is far too speculative to justify the invalidation of the Arbitration Agreement.

In sum, *Harris v. Green Tree Financial Corp.* is indistinguishable from the present case in any important respect and is therefore controlling on this issue. As such, the "dual system" provision in the Arbitration Agreement does not render it unenforceable.

### 2. Costs Associated With Arbitration

■ Harris next argues that the relevant cost provisions will preclude her from vindicating her rights, and thereby constitute grossly unfair terms in violation of public policy. The Arbitration Agreement lists three possible arbitration organizations: the National Arbitration Forum, the American Arbitration Association, and J.A.M.S/Endispute (JAMS). Each arbitration organization charges substantial fees, including fees relating to filings, hearings, and discovery requests. Harris alleges that she has no money to pay the costs of arbitration, regardless of the amount. Even though the agreement provides for "fee shifting," *i.e.*, it states that "at the conclusion of the arbitration the arbitrator will decide who will ultimately be responsible for paying the filing, administrative and/or hearing fees," Harris contends that this shifting is discretionary and is, in any event, too late if the homeowner does not have the money to lay out at the beginning of arbitration. And although the Arbitration Agreement allows for a possible "temporary advance" of some or all of the arbitration costs, she argues that this "so-

lution" contravenes public policy since it is nothing more than a forced loan, notwithstanding the possibility that it will not have to be paid back at the conclusion of the arbitration. While the three arbitration organizations provide for waiver or a reduction of some of the costs, Harris contends that these provisions are limited, effective only after a party has actually submitted to arbitration, and without set standards. Finally, the Arbitration Agreement permits an appeal of the original arbitration decision, though it provides that the costs of an appeal will be borne by the appealing party, regardless of the outcome of the appeal. Harris contends that this cost provision, which by its terms prohibits any reallocation of costs, effectively precludes her from filing an appeal of any arbitrator's decision. Delta responds that these issues concerning the cost of arbitration are moot, as it has unconditionally offered to pay all costs, including any costs associated with an appeal.[4]

The Supreme Court has acknowledged that "the existence of large arbitration costs could preclude a litigant … from effectively vindicating her … statutory rights in the arbitral forum." *Randolph,* 531 U.S. at 90, 121 S.Ct. 513. The burden is on the party opposing arbitration to show that the cost would render it an ineffective forum. *Id.* at 92, 121 S.Ct. 513. If the splitting or sharing of the costs of the arbitral forum under a particular arbitration agreement effectively prevents the vindication of a plaintiff's statutory rights, those rights cannot be subject to mandatory arbitration under that agreement. *See, e.g., Williams v. Cigna Fin. Advisors, Inc.,* 197 F.3d 752, 763 (5th Cir.1999) (holding that *Gilmer* "plainly indicates that an arbi-

---

4. The parties also dispute the applicable cost rules of the three arbitration organizations. As discussed below, given Delta's willingness to pay all costs of arbitration, the Court need not reach this issue.

tral cost allocation scheme may not be used to prevent effective vindication of federal statutory claims"), *cert. denied,* 529 U.S. 1099, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000). Harris has come forward with evidence that the costs associated with arbitration, if she were required to pay the costs, would effectively preclude her from pursuing her CFA claims. However, under the Arbitration Agreement (and the relevant rules of the three potential arbitration organizations) there is a real possibility that Harris will be required to pay nothing. The Arbitration Agreement provides that Delta will consider providing a "temporary advance" on any fees, and the Arbitration Agreement does not preclude the arbitrator from awarding costs to a prevailing consumer. There is no reason to suppose an arbitrator will ignore the dictates of the CFA concerning the allocation of costs or expenses. *See Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 24, 647 A.2d 454 (1994) (holding that consumer-fraud plaintiff can recover reasonable attorneys' fees, filing fees, and costs if that plaintiff can prove that defendant committed unlawful practice). The Court need not decide if this possibility is enough to preclude a finding that arbitration would be prohibitively expensive for Harris, as she cannot demonstrate that the cost would render arbitration an ineffective forum in light of Delta's willingness to pay any and all costs.

Harris further argues that Delta should not be permitted to unilaterally modify the existing agreement by offering to pay the costs of arbitration. The Court disagrees, though the Third Circuit has yet to definitively rule on this issue. In *Alexander,* the Third Circuit recognized an apparent inconsistency between two prior cases on this issue, but stated that "[w]e express no opinion at this time as to the appropriate role of these offers." 341 F.3d at 270 n. 10. In one of those prior cases, *Blair v.*

*Scott Specialty Gases,* the court indicated that the other party should be afforded the opportunity to "offer to pay all of the arbitrator's fees." 283 F.3d at 610. Yet, in another case, *Spinetti v. Service Corp. Int'l,* the court rejected "after-the-fact" offers as irrelevant to the cost inquiry. 324 F.3d 212, 218 n. 2 (3d Cir.2003) (quoting *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 676 (6th Cir.2003) ("Our concern is that cost-splitting provisions will deter potential litigants from bringing their statutory claims in the arbitral forum.")). At issue in *Spinetti,* however, was a fee-splitting (as opposed to fee-shifting) provision which required the plaintiff to pay his or her own attorneys' fees and costs, regardless of the outcome of the arbitration, as well as one-half of the costs of arbitration 324 F.3d at 215. The Third Circuit ruled that the defendant's offer to pay costs should not be considered since the cost provision on the face of the arbitration agreement could "deter potential litigants from bringing their statutory claims in the arbitral forum." *Id.* at 217 n. 2. Here, in contrast, the agreement does not contain such terms; rather, it has a fee-shifting provision, which permits the arbitrator to decide (presumably in accordance with the requirements of any relevant statute) who will ultimately be responsible for paying the costs. In addition, it provides that the arbitration will be in accordance with the rules of the three arbitration organizations, which, in certain instances, permit waiver or reduction of fees. Consequently, the potential for deterring potential litigants from bringing statutory claims is significantly less in these circumstances. This case is therefore distinguishable from *Spinetti.* And considering the liberal federal policy favoring arbitration agreements, the Court believes, in accordance with *Blair,* that Delta's offer to pay the

costs of arbitration should be given effect.[5]

Harris separately argues that the appeal procedure-the appealing party must bear the costs regardless of the outcome of the appeal-has a deterrent effect, which is compounded by the fact that the appeal procedure denies the express right of a prevailing consumer under the CFA to costs. *See Cox*, 138 N.J. at 24, 647 A.2d 454 (1994). Though this argument is not entirely devoid of merit, Delta's offer to pay the costs of an appeal adequately addresses any concerns the Court might have. In any event, it is clear that this provision represents only a part of the agreement and could, if necessary, be severed without disturbing the primary intent of the parties to arbitrate their disputes. *See Spinetti*, 324 F.3d at 214 (upholding district court's decision to enforce arbitration agreement while voiding arbitration costs provision).

The Court concludes that given Delta's willingness to bear the costs of arbitration, Harris has not demonstrated that arbitration would be prohibitively expensive for her.[6] Accordingly, the cost provision in the Arbitration Agreement is not unconscionable.

### 3. Class Actions

■ The Arbitration Agreement states that "there shall be no right or authority for any claims to be arbitrated on a class ... action basis." Harris contends that this restriction, combined with the numerous other provisions in the agreement which grossly favor the lender, renders the agreement unenforceable by frustrating the vindication of her statutory rights. The Court disagrees, relying on two recent cases from the Appellate Division and the Third Circuit.

In *Gras*, where plaintiffs brought an action alleging, among other claims, that certain loan agreements violated the CFA, the Appellate Division rejected the claim that an arbitration agreement was void because it contravened public policy by precluding class actions. After noting that the CFA does not specifically create a private right to bring a class action and that plaintiffs can vindicate their statutory rights in the arbitration forum, the Court reasoned that, "the absence of a legislative mandate or overriding public policy in favor of class actions leads us to conclude that the arbitration provision in question here is enforceable." 346 N.J.Super. at 52–54, 786 A.2d 886. Although recognizing the public policy behind the CFA—to root out consumer fraud—the Court noted that that policy must be balanced by a competing and compelling public policy favoring arbitration as a means of dispute resolution and requiring a liberal construction of contracts in favor of arbitration. *Id.* at 54, 786 A.2d 886. Thus, because a plaintiff could achieve all statutory remedies in the

---

5. This conclusion is consistent with a recent decision from the Eleventh Circuit. *See Anders v. Hometown Mortg. Serv., Inc.*, 346 F.3d 1024, 1026 (11th Cir.2003) ("[A]ny problem involving whether the plaintiff can afford the cost of arbitration is no problem in light of the defendant's stipulation to pay the plaintiff's costs of arbitration ... ").

6. In a very recent case from the Northern District of Ohio, *Anderson v. Delta Funding Corp.*, No. 1:03–CV–0900, the court enforced Delta Funding's arbitration agreement, rejecting the argument that it was unconscionable because of the costs associated with arbitration. Specifically, the court observed that unlike a "fee-splitting" provision, the cost provision in the agreement could hardly be considered unconscionable, because of the likelihood that the arbitrator, after taking Anderson's limited financial means into consideration, would hold Delta responsible for paying costs. Moreover, given that Delta agreed to pay all costs associated with arbitration, Anderson could not prove the costs of arbitration would be prohibitive.

arbitration forum, even in the absence of a class action, the arbitration provision in question was enforceable. *Id.*

Likewise, in *Johnson v. West Suburban Bank*, the Third Circuit held that claims under the TILA and the Electronic Fund Transfer Act ("EFTA") can be referred to arbitration under an arbitration clause when a plaintiff seeks to bring claims on behalf of multiple claimants, even though such arbitration clauses may render class actions unavailable. 225 F.3d at 368. The Third Circuit reversed a district court decision which had concluded that "an inherent conflict existed because 'without the possibility of class action liability looming on a creditor's horizon, there is a very real possibility that these entities will not voluntarily comply with the Truth in Lending regulations.'" *Id.* at 371 (quoting *Johnson v. Tele–Cash, Inc.*, 82 F.Supp.2d 264, 271 (D.Del.1999)). "Because neither the TILA nor the EFTA explicitly precludes the selection of arbitration instead of litigation, a party who agrees to arbitrate, but then asserts that his or her statutory claim cannot be vindicated in an arbitral forum, faces a heavy burden." *Id.* at 369. The court thus concluded, "[e]ven if we were to conclude that the statute implies a right to proceed as a member of a class, *Gilmer* indicates that rights of this nature are waivable so long as the rights the statute was designed to protect may be vindicated by other means." *Id.* at 377–78.

Harris attempts to distinguish *Gras* and *Johnson* by arguing that the question in those cases was whether a prohibition on class actions alone violates public policy or renders enforcement of statutory rights ineffective, whereas the question in this case is whether such a restriction, when combined with other grossly unfair provisions, frustrates the vindication of statutory rights. However, the Court does not believe that the other provisions at issue

are oppressive or unconscionable, especially in light of Delta's willingness to pay all costs of arbitration and, as discussed below, this Court's decision to enforce the Arbitration Agreement pursuant to an order that the proceedings and award not be kept confidential. Therefore, Harris's attempt to distance this case from *Gras* and *Johnson* is unavailing.

### 4. Confidentiality Rules

■ Harris argues that the Arbitration Agreement incorporates confidentiality rules that effectively insulate Delta from meaningful legal opposition by ensuring that none of its potential opponents have access to precedent, resulting in decreased public awareness of its predatory practices and thereby thwarting the proper functioning of the CFA. While the Court appreciates the potential deleterious effects of confidentiality provisions that tend to enshroud improper business practices behind a veil of consumer ignorance, Harris's argument here is of no real moment, as Delta is not relying on the confidentiality of the arbitration proceedings or any potential award. Indeed, the Arbitration Agreement says nothing about confidentiality; rather, it incorporates the applicable rules of either JAMS, NAF, or AAA in effect at the time a relevant claim is filed, including those rules pertaining to confidentiality. Because the applicable confidentiality provisions are collateral to the main purpose of the Arbitration Agreement, the Court will accept Delta's invitation to enforce the remainder of the Arbitration Agreement while ordering that the proceedings and award need not be kept confidential. This should allay Harris's concerns about the confidentiality provisions. *See Lloyd v. Hovensa LLC*, 243 F.Supp.2d 346, 352 (D.Vi.2003) (enforcing dispute resolution agreement without incorporated AAA rules regarding confidentiality); *Jacob v. Norris, McLaughlin &*

*Marcus,* 128 N.J. 10, 33, 607 A.2d 142 (1992) ("[I]F the illegal portion does not defeat the central purpose of the contract, we can sever it and enforce the rest of the contract") (citations omitted). Accordingly, the Court need not decide whether the confidentiality provisions, as incorporated into the Arbitration Agreement from the relevant rules of the three arbitration organizations, are unconscionable.

## III.

## CONCLUSION

The Arbitration Agreement does not consist of "grossly unfair contractual obligations," *Marinello,* 63 N.J. at 408, 307 A.2d 598, or contain terms that are "oppressive or unconscionable," *Martindale,* 173 N.J. at 91, 800 A.2d 872. Nothing in the agreement precludes Harris from vindicating her statutory rights in the arbitral forum.

For the foregoing reasons, Harris's motion for summary judgment will be denied and Delta's cross-motion to compel arbitration will be granted.[7]

Accordingly, **IT IS** on this 1st day of March 2004

**ORDERED** that Defendant Alberta Harris's motion for summary judgment is denied; and it is further

**ORDERED** that Plaintiff Delta Funding Corporation's motion to compel arbitration is granted; and it is further

**ORDERED** that the arbitration proceedings between Plaintiff Delta Funding Corporation and Defendant Alberta Harris, including any testimony, exhibits, records or award, need not be kept confidential, and that any costs associated with

obtaining a record or award will be borne by Delta Funding Corporation, in accordance with its agreement to pay any and all costs of arbitration.

---

7. Delta also requests this Court to enjoin Harris from litigating her claims against it in state court. Given the Chancery Division's decision to stay its own proceedings pending

resolution of this matter, such relief would appear to be unnecessary, and in any event, for the Chancery Division to first consider in light of this decision.