HUNTS POINT COOPERATIVE MARKET, INC., a New York Cooperative Corporation, Appellant, No. 08–2083

v.

MADISON FINANCIAL LLC, Appellant, No. 08–2133.

Nos. 08–2083, 08–2133.

United States Court of Appeals, Third Circuit.

Argued April 21, 2009.

Filed: Aug. 28, 2009.

James W. Perkins (Argued), Greenberg Traurig, New York, NY, for Hunts Point Cooperative Market, Inc.

Patricia M. Graham, Herrick Feinstein, Princeton, NJ, Barry Werbin (Argued), Herrick Feinstein, New York, NY, for Madison Financial LLC.

Before: SCIRICA, Chief Judge, SLOVITER and FISHER, Circuit Judges.

## OPINION OF THE COURT

FISHER, Circuit Judge.

Hunts Point Cooperative Market, Inc. ("Hunts Point") appeals from the District Court's order in which it found Hunts Point liable to Madison Financial LLC ("Madison") for the amount of $1,010,435.00. Madison originally sued Hunts Point claiming breach of contract following Hunts Point's failure to pay money owed on five notices of purchases (an "NOP" or the "NOPs"), as well as collection of accounts under Uniform Commercial Code ("U.C.C.") Article 9. The District Court held that Hunts Point breached its contractual obligations because the NOPs were valid and enforceable, and thus declined to reach Madison's U.C.C. Article 9 claims and Hunts Point's corresponding

Article 9 defenses. It also denied Madison an award of prejudgment interest. Hunts Point argues on appeal, inter alia, that the District Court erred in failing to consider its Article 9 defenses. In Madison's cross-appeal, Madison argues that the District Court abused its discretion in not awarding prejudgment interest on the damages. Because we agree that the NOPs were valid and enforceable contracts, we will affirm the District Court's judgment in favor of Madison, but we will reduce the amount of damages by the amount of $263,497.74. We will also affirm the District Court's decision not to award Madison prejudgment interest.

## I.

We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

### A. Background on Madison

Around March 1999, Christopher Maguire and George Sneddon (Maguire's then-father-in-law) formed Madison Financial Corporation ("MFC"), a New Jersey corporation, to provide factoring services.[1] Sneddon owned 100% of MFC's stock. Madison is a New Jersey limited liability company that arose from MFC and was established on June 10, 1999, also with the purpose of factoring accounts receivable. According to Madison's November 12, 1999 Operating Agreement (the "Operating Agreement"), Madison was originally formed with three members: Cherbrooke Associates, LLC ("Cherbrooke"), as represented by its part-owner John Marozzi;

---

1. Factoring is defined as "[t]he buying of accounts receivable at a discount," where "[t]he price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." *Black's Law Dictionary* 630 (8th ed. 2004). An account receivable is "[a]n account reflecting a balance owed by a debtor; a debt owed by a customer to an enterprise for goods or services." *Id.* at 18.

the Morrocco Group, LLC ("Morrocco Group"), as represented by Vincent Morrocco and Marozzi; and Service Capital Corporation, LLC ("Service Capital"), a company owned by Maguire. Through a Stock Purchase Agreement dated December 21, 1999, Madison purchased 100% of MFC's stock from Sneddon, its sole shareholder, and MFC succeeded to the interests of Madison. Under the Operating Agreement, Madison had no managing member and instead was to be directed by a board of managers appointed by its members. Donna Brewer–Rossi joined Madison in June 1999 and currently serves as its Controller. During the course of the events giving rise to the instant appeal, Brewer–Rossi and Marozzi worked out of Madison's Pine Brook, New Jersey office, and Maguire and Sneddon worked out of Madison's Bridgewater, New Jersey office (which they shared with Service Capital).

Sneddon served as director and vice president of Madison, and was responsible for executing necessary documents such as factoring agreements, assignments, estoppel agreements (or NOPs), U.C.C. forms, and notice letters each time Madison purchased an account. Sneddon was also responsible for verifying the accounts before Madison advanced funds to its clients, including running a credit check on a prospective client, obtaining the underlying contracts between the client and account debtor, and confirming with the debtor that the invoice amounts were due and owing. For private account debtors, Madison would usually verify that the amounts in the invoices were actually due by sending an NOP to the account debtor to acknowledge, sign, and return. Sneddon would notify all parties that the client had sold its accounts receivable to Madison and inform the account debtor to thereinafter pay Madison directly for the amounts on the invoices instead of the client. Sneddon generally required all three parties—Madison, the client, and the account debtor—to sign a document acknowledging the sale of the invoice to Madison and Madison's funding to the client, and typically obtained a signed copy of an NOP for each account. Sneddon's typical practice was to call the account debtor after receiving its signed NOP in order to verify the signature on it. After Sneddon received all the required paperwork, he faxed a funding request, with its supporting documents, to Brewer–Rossi in Madison's Pine Brook office. Upon receipt of that information, Brewer–Rossi was authorized to wire money—typically 70% of the client's accounts receivable—to Madison's client, and Madison would thereby purchase the accounts receivable. After making the wire transfer, Brewer–Rossi entered information about the transaction in the company's reports. Based on its agreement with the client, Madison would collect a fee for its services on the account and, when appropriate, credit its client any amount due that it collected. Madison would retain the remaining 30% balance on the accounts receivable purchased in "reserve" until the account debtor paid Madison in full, at which point Madison would mark the invoice as "closed" on its books, take its fee (as determined by the amount of time an invoice remained unpaid), and pay its client the net amount received.

## B. Background on Westway and Hunts Point

Westway, a New York corporation, provided construction services as its business. Madison entered into a purchase agreement (the "Purchase Agreement") with Westway on January 10, 2000, through which it purchased all of Westway's existing and future accounts receivable. In consideration, Madison agreed to make monetary advances to Westway. Westway submitted to Madison invoices or payment requisitions for its accounts receivable from fourteen account debtors, including

Hunts Point. Madison purchased the accounts receivable for the requisitions Westway had forwarded in accordance with the terms of the Purchase Agreement. Madison then sent NOPs to notify the private entity account debtors, under its typical procedure, that all future payments of accounts receivable should be made to Madison.

Under the Purchase Agreement, Westway obtained $6 million in credit for its outstanding accounts receivable and was responsible for paying Madison for all accounts or invoices that remained unpaid by the account debtor ninety days after their factoring. Despite these terms, Westway had numerous payments outstanding for more than ninety days (including some outstanding more than 150 days) and, in total, Westway had more than $8 million in outstanding invoices. Marozzi testified that Madison violated its own policies in numerous ways in the course of handling Westway's factored invoices.

Hunts Point is a cooperative wholesale meat distribution market located in the Bronx, New York. In mid–1999, Hunts Point decided to construct a new refrigerated warehouse (the "Project") with city and state funding. Hunts Point entered into two contracts with Westway for construction services. Hunts Point hired Jeffrey M. Brown Associates, Inc. ("Brown") as its construction manager, and Brown began to submit applications for payment to Hunts Point, specifying in each of the eight applications that payment should be made to Westway. Either Bruce Reingold, Hunts Point's General Manager, or another representative, reviewed each of Westway's applications, and Hunts Point approved each one and forwarded them to the government for payment. Reingold is responsible for the day-to-day activities at Hunts Point—including financial affairs, operational and security matters—and serves as the person to whom all department heads report. Reingold works with Hunts Point's accountants in the preparation of financial statements, handles the collection of rents, oversees construction projects (including the Project), and oversees and approves its payments to construction contractors. Among the Westway accounts purchased by Madison were five accounts on which Hunts Point was Westway's account debtor.

## C. The NOPs

Madison and Westway executed five written assignments (the "Assignments") to evidence Madison's purchase of the accounts receivable at issue. Each assignment lists Hunts Point under either the "Account Name and Address" field or as the "Customer" and includes an invoice and amount due. The Assignments, correspondingly, related to five requisitions issued by Westway and delivered to Madison. In accordance with normal procedure, Madison (via Sneddon) forwarded an NOP to Hunts Point for each of the Westway accounts receivable on which Hunts Point was the account debtor. Reingold signed each of the first five NOPs on behalf of Hunts Point, and later admitted that he was authorized to do so. On each NOP, Sneddon filled in the exact dollar amount due on the referenced account, prior to signing it himself and prior to forwarding it to Reingold.

Sneddon, Reingold, and Stephen Nigro (President of Westway) each executed the first NOP, dated March 1, 2000, on behalf of their respective parties to the payment arrangement for the account receivable. Sneddon received the signed NOP from Reingold on March 2, 2000 and, in accordance with Madison's normal procedure for handling the first NOP with an entity, called Reingold to ensure the invoice was legitimate and that the money was due and payable. Sneddon's copy of the first NOP

has a handwritten note that states: "Spoke w/ Bruce Reingold 3–2–00. He verified signing attached letter." Telephone records indicate that someone in Madison's Bridgewater, New Jersey, office placed a phone call to Hunts Point's Bronx, New York, office at 2:36 p.m. that lasted for 52 seconds on March 2, 2000. Sneddon testified that during his conversation with Reingold, he received the impression that Reingold "understood this was an assignment of an invoice that Westway was giving to, assigning to Madison Financial and that [Reingold] understood the payments for that invoice were to go to Madison Financial LLC." Reingold did not deny that the phone call between him and Sneddon took place, but testified that he could not remember it. The District Court found Sneddon's testimony credible, as supported by the paper evidence, and adopted it as fact.

Each of Madison's NOPs with Westway and Hunts Point, including the first NOP, listed a specific amount that Hunts Point owed Madison, "pursuant to the attached invoice(s)," and stated that, by executing the NOP, the amount to be paid to Madison was "owed absolutely" and that Hunts Point had no defenses to payment. Additionally, the NOPs stated that, by signing, Hunts Point "acknowledges that the [specific dollar amount] owing by [Hunts Point] to [Westway] shall be paid directly to [Madison]. This assignment may only be released by [Madison] and no action of [Westway] shall affect any of [Hunts Point's] obligations to make payment directly to [Madison]." The NOP also states that "[t]he Undersigned [i.e., Hunts Point] acknowledges that payment to any party other than [Madison] will not constitute payment of indebtedness owing by [Hunts Point] to [Westway]." However, Madison did not attach an invoice to the first NOP,

or any of the following NOPs it sent to Hunts Point.

Reingold testified at trial that:

I signed the first notice of purchase in I guess on March 1st. I had received the phone call from Gary Parker who I believe was the vice-president of Westway Industries. He told me that he was in the area, needed to talk to me and could he stop up and see me. And a few minutes later he pulled into the Market and came up to my office, and presented this piece of paper to me and asked if I would sign it in connection with helping Westway obtain a loan for this project. I signed the document at that time.

. . .

I asked him at the time when he would have more people on the job. We were getting a little frustrated and he had made some promises to us that they were going to be able to start immediately. He told me they needed some money. Money was paid up in some other jobs. If I could sign a requisition for them to get a loan, they would have people there a little quicker.

So in connection with that, I signed the document.

Additionally, Reingold testified in his pretrial deposition that "[i]t was certainly in Hunts Point's interest to make sure that Westway was able to staff the job properly. By signing the document, that is what I thought I was doing." Reingold reiterated this sentiment at trial, testifying that he signed the first NOP because he believed he was helping Westway obtain a loan to acquire financing for the Project, which was in Hunts Point's interest because he wanted construction to continue. Although Reingold said it was generally his practice to read documents before signing them on behalf of Hunts Point, he testified that he did not read the first NOP before signing it, nothing was attached to it, and

he did not notice that the document's caption said "notice of purchase of accounts receivable." He testified that:

I didn't read it. I had no reason to believe what [Parker] was telling me would be incorrect. I took him at his word. I thought it was going to be something that would help him do the job a little bit quicker and I signed the document.... I thought I was signing something acknowledging that we had a contract with them and then [Parker] was going to be able to go out and borrow money against that without committing Hunts Point to anything. That's what I thought I was signing.

Madison issued five more NOPs, and Westway, Hunts Point (via Reingold), and Madison executed four of them. The terms of NOPs two through five were identical to the first NOP, except that each reflected a different invoice amount that Hunts Point owed Madison. Reingold testified that he did not read NOPs two through five, did not retain copies of them, and did not inform anyone at Hunts Point that he had signed them. Reingold refused to sign the sixth NOP because of Hunts Point's dissatisfaction with Westway's performance on the Project.[2]

For the first NOP, Sneddon forwarded a funding request to Brewer–Rossi based on the February 28, 2000 requisition, which consisted of the documents Sneddon obtained and assembled before Madison advanced any funds, including various information related to the transaction and Hunts Point's financial condition. Sneddon testified that he followed the same procedure for funding each of the other four Hunts Point accounts from Westway. Brewer–Rossi funded each of the requisitions by arranging a wire transfer from Madison to Westway for approximately 70% of their face amount. She testified that Madison wire-transferred the money to Westway for the first five NOPs only after it received documentation that the NOP was executed by all three parties. In total, Madison advanced a total of $1,961,149.70 to Westway based on the Hunts Point accounts. Subtracting the amount wired for the sixth NOP, which Reingold never signed, Madison advanced $1,798,300.00 to Westway, including $250.00 in extra fees.

### D. Problems at Madison

Sneddon, Marozzi, Brewer–Rossi, and Maguire all testified that at the time Sneddon received the assignments and signed the five NOPs for the Westway accounts, Madison was not aware that Westway was in default for any of its obligations to Hunts Point or that any of the requisitions was false or fraudulent. In fact, Hunts Point made regular payments on the NOPs from April 2000 to September 2000, including four checks payable to Westway that were endorsed to Madison totaling $1,358,565.00. Madison credited these payments toward the money Hunts Point owed on the Westway accounts. Hunts Point made two additional payments payable to Westway that were endorsed to Service Capital, totaling $263,497.74, which Madison did not receive and did not credit. Hunts Point drew another check in the amount of $60,000.00 to the order of Westway that was also endorsed by Westway. Madison likewise did not receive or credit this check because the plain language of the NOPs did not allow Hunts Point to pay Westway directly for the amounts due on them. Madison received a cashier's check dated September 25, 2000, in the amount of $200,000.00, and agreed to credit that

**2.** Madison did not seek recovery in the form of damages for the amount in the sixth NPO in its case before the District Court.

sum to the Hunts Point account and reduce its damages claim accordingly.

Madison first learned of Hunts Point's dissatisfaction with Westway's work on the Project in September 2000. In a September 11, 2000 fax, Sneddon sent the sixth NOP to Hunts Point and Westway for signatures to approve a $233,000.00 advance from Madison to Westway, which Hunts Point refused to sign. Madison wire-transferred the advance to Westway before obtaining Hunts Point's signature on the NOP. Hunts Point made its last payment to Westway on September 20, 2000. Reingold stated that by October 16, 2000, he had approved over $2 million of payments from Hunts Point to Westway under the parties' two construction contracts relating to the Project. In a letter dated October 5, 2000, Hunts Point informed Westway that it was in default under one of the contracts and, in an October 12, 2000 letter, Westway denied that it was in default. In a December 20, 2000 letter, Madison informed Hunts Point that Westway had defaulted under the Purchase Agreement and advised Hunts Point that all money due to Westway was to be paid directly to Madison. One or more representatives from Madison called Hunts Point to demand payments on the outstanding accounts. Hunts Point denied that it owed money and made no payments to Madison. Brewer–Rossi calculated the total amount Hunts Point still owed Madison as $1,010,435.00.

In 1999 and 2000, Madison had approximately fifteen to twenty clients, including Westway. Fewer than two years after its formation, Madison discovered that Maguire was diverting payments to Service Capital. Brewer–Rossi and Marozzi became suspicious of certain defaulted account payments, and began their own internal investigation. They confronted Maguire with their findings in November 2000, and he confessed to stealing funds from Madison and promised to pay back the money he had taken. Marozzi testified that Maguire committed a "massive fraud," resulting in a financial loss to Madison of over $7.6 million. Around this time, Sneddon also discovered some troubling facts regarding Madison's maintenance of the Westway accounts and, although he did not confront Westway directly with these findings, he relayed his concerns to Maguire and the individuals at Madison's Pine Brook office, who told him they would "take care of it."

As a result of Madison's discovery of his fraud, Maguire transferred his interest in Madison, as held through Service Capital, to Cherbrooke and the Morrocco Group by assignment on January 11, 2001. He resigned from Madison and was barred from conducting any future business on its behalf. Eventually, Maguire and Service Capital executed a consent judgment for $1.3 million in favor of Madison, entered in the Superior Court of New Jersey. A New Jersey grand jury indicted Maguire on November 7, 2001, for first-degree money laundering, second-degree theft by deception and bad check charges, as well as offenses related to the money he stole from Madison. In 2002, Maguire was convicted of a felony based on the charges arising out of his operation and management of Madison from 1999 to 2000.

### E. Procedural History

Madison filed its complaint against Hunts Point in the District Court, claiming collection of accounts under U.C.C. Article 9, breach of contract, and promissory estoppel. Following discovery, Madison filed a motion for summary judgment, which the District Court denied on March 1, 2004, the day before trial commenced. The District Court held a bench trial. On March 17, 2008, the District Court determined that Hunts Point was liable to Madison for breach of contract, concluding that the NOPs were valid and enforceable, and, in

the alternative, determining that the doctrine of promissory estoppel would also render the NOPs enforceable. It declined to reach Madison's U.C.C. Article 9 claims, stating that "damages would be no greater than those for liability for breach of contract" if it found Hunts Point liable under Article 9. The District Court ordered judgment in favor of Madison in the amount of $1,010,435.00, the full amount of its claim, plus post-judgment interest and costs to be taxed, but denied prejudgment interest to Madison. Hunts Point filed a timely notice of appeal. Madison filed a timely notice of cross-appeal, in which it seeks prejudgment interest of at least $396,830.11.

## II.

The District Court had subject matter jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332(a). We exercise jurisdiction over this appeal under 28 U.S.C. § 1291. The "issue of contract formation invokes a mixed standard of appellate review. The district court's factual findings, especially with respect to the parties' intentions, will not be reversed unless the record demonstrates that they are clearly erroneous." *ATACS Corp. v. Trans World Comm'ns*, 155 F.3d 659, 665

(3d Cir.1998); *see also* Fed.R.Civ.P. 52(a). "Similarly, the interpretation of contractual language to discern contractual intent is a factual question, which we will accordingly review under a clearly erroneous standard. Conclusions drawn with respect to the legal effect of any agreement, however, are questions of law and therefore subject to plenary review." *ATACS*, 155 F.3d at 665 (citation omitted). Regarding Hunts Point's other arguments, "[t]he district court's findings of fact are subject to the clearly erroneous standard, and its conclusions of law are subject to plenary review." *Menichini v. Grant*, 995 F.2d 1224, 1228 (3d Cir.1993). "As a federal court exercising diversity jurisdiction, we are obliged to apply state substantive law...." *Id.* at 1228 n. 2. Finally, with respect to Madison's cross-appeal, "[w]e review a district court's determination to require the payment of prejudgment interest for abuse of discretion." *Thabault v. Chait*, 541 F.3d 512, 533 (3d Cir.2008) (citing *Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972, 982 (3d Cir.1984)).

## III.[3]

### A. Contract Theories

Hunts Point argues the District Court erred in holding that the NOPs were valid

---

[3]. Whether Madison engaged in fraudulent conduct influences much of our analysis. Hunts Point argues that the District Court erroneously found that Madison did not participate in Westway's factoring of false invoices and did not know or should not have known of this fraud. Based on our review of the facts, we cannot conclude that the District Court clearly erred in its findings, and thus reject Hunts Point's arguments along those lines. While it is clear that Maguire committed fraud while a principal at Madison, we are not convinced that Madison or its other employees knew or should have known of his pervasive fraud. Our conclusion that the District Court's determination of the facts was largely correct underlies our legal conclusions. *See* Fed.R.Civ.P. 52(a)(6); *see also*

*Anderson v. Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Further, Hunts Point argues that the District Court erred in failing to bind Madison by the acts of its agents, Sneddon and Maguire. Because we find it questionable whether Sneddon had knowledge of any fraud in the invoices he factored on the Hunts Point accounts, we conclude that the District Court did not err in finding insufficient evidence that the NOPs were fraudulent or that Sneddon had knowledge of fraud when preparing the paperwork for the Hunts Point NOPs. Additionally, Maguire's massive fraud was not within the scope of his employment at Madison because his acts were clearly criminal and not in his employer's interest. *See Gotthelf v. Prop. Mgmt. Sys., Inc.*, 189 N.J.Super.

and enforceable contracts, asserting that they fail for lack of consideration, the invoices were false and unattached to the NOPs when Madison received the signed and delivered copies, and Madison waived its right to insist on payment from Hunts Point by knowingly allowing Hunts Point to pay Westway directly. We conclude, however, that Hunts Point breached its obligation to pay the amounts owing in the NOPs under contract principles.

■ Hunts Point argues the NOPs fail for lack of consideration because Westway had a preexisting duty to perform the construction contracts, the NOPs were not "bargained for in fact," and Hunts Point did not receive the benefit of Westway completing its contractual duties as a result of its alternate funding source. Under New Jersey law, "[v]aluable consideration may take the form of either a detriment incurred by the promisee or a benefit received by the promisor." *Cont'l Bank of Pa. v. Barclay Riding Acad., Inc.*, 93 N.J. 153, 459 A.2d 1163, 1172 (1983). In a similar Connecticut case, which we find persuasive, a district court held that NOPs of accounts receivable were supported by consideration where the developer of a baseball stadium agreed to assign his debt to a factoring company through the NOPs and, in doing so, relinquished his right to pay the subcontractor directly for those debts. *See Brookridge Funding Corp. v. Nw. Human Servs.*, 175 F.Supp.2d 355 (D.Conn.

2001), *modified*, 2004 WL 1897004 (D.Conn. Aug. 18, 2004), *modified*, 2007 WL 1834175 (D.Conn. June 26, 2007) *(Brookridge III)*, *aff'd*, 2009 WL 1174666 (2d Cir. May 1, 2009) (not published). The court held that the developer, in signing the NOPs, received the benefit of the subcontractor continuing construction on the stadium, as opposed to postponing the project to wait for the subcontractor's original financing source, and that adequate consideration therefore rendered the NOPs enforceable. *Brookridge III*, 2007 WL 1834175, at * 1–3. Similarly, here, Reingold's testimony indicates that he signed the NOPs based on his desire to expedite construction on the Project. Although Westway already had a contractual duty to provide the construction services to Hunts Point, Reingold signed the NOPs to allow Hunts Point the additional benefit of Westway's construction work occurring before it otherwise would have, absent sufficient funding. Furthermore, Madison, not Westway, advanced the funds, and thus the benefit, to Hunts Point, and Madison suffered a considerable detriment in advancing large sums of money to Westway. Therefore, consideration exists both as to the benefits Hunts Point received, and the detriments Madison suffered.[4] Because we resolve this issue under contract principles, we need not decide whether the NOPs are also enforceable under the doctrine of promissory estoppel.

237, 459 A.2d 1198, 1199–1200 (N.J.Super.Ct.App.Div.1983).

4. To the extent that Hunts Point argues Reingold was fraudulently induced to sign the NOPs by Westway's employees' representations, we disagree. The evidence does not demonstrate that Westway made specific misrepresentations on which Reingold relied, nor does it show that anyone prevented Reingold from reading the NOPs to ascertain their meaning himself, or that Reingold was unable to ask Sneddon about their import during the

March 2, 2000 phone call or on his own initiative. *See Gras v. Assocs. First Capital Corp.*, 346 N.J.Super. 42, 786 A.2d 886, 894 (N.J.Super.Ct.App.Div.2001) ("Failing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading." (internal quotation marks omitted)). Therefore, we need not reach the civil procedure issue of whether Hunts Point effectively raised the defense of fraudulent inducement before the District Court.

■ Next, we agree with Madison that the NOPs are valid and enforceable despite being executed without the referenced invoices attached. Both parties agree that the dollar amount indicating the money Hunts Point owed Madison was present on the face of each NOP, and thus the essential term at issue was conspicuously available for interpretation by both Hunts Point and the District Court. *See Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank,* 163 N.J.Super. 463, 395 A.2d 222, 227 (N.J.Super.Ct.App.Div.1978) (explaining that a contract is definite enough and contains essential terms when it enables a court to determine what "the promisor undertook to do"). Further, we find the case upon which Hunts Point relies for the proposition that the NOPs are invalid without the attached invoices distinguishable. *See 21st Capital Corp. v. Tiffany & Co.,* No. A–2602–06T2, 2008 WL 313455 (N.J.Super.Ct.App.Div. Feb. 6, 2008). In contrast to the NOPs at issue here, the NOP-equivalent invoice in *21st Capital* was wholly and clearly fraudulent. *Id.* at *2.

■ We next consider Hunts Point's argument that Madison waived its right to insist on strict compliance with the NOPs by knowingly allowing Hunts Point to pay Westway the amounts Madison insists were due to it. We disagree, in part, because Hunts Point never paid either Madison or Westway the majority of the money at issue, and thus Madison has not waived Hunts Point's nonpayment of that amount under any theory. However, we find persuasive Hunts Point's argument that the District Court should have credited two additional payments Hunts Point made to Westway when it calculated the amount of Madison's damages. Hunts Point made the August 2000 and September 2000 payments directly to Westway, exactly as it had done with the four earlier checks, but Westway endorsed the checks to Service Capital rather than Madison.

Madison did credit four earlier payments Hunts Point had made to Westway that were subsequently endorsed to Madison. Because Maguire owned Service Capital, Service Capital was an original corporate member of Madison, it shared Madison's Bridgewater, New Jersey office with Maguire and Sneddon, and Maguire used Service Capital as a vehicle through which he perpetrated his fraud, we conclude that Hunts Point should not bear the loss for the two payments that were improperly diverted from Westway to Service Capital. Thus, we will reduce Madison's damages award by $263,497.74 to credit Hunts Point for the two checks it made payable to Westway that were endorsed to Service Capital, but will otherwise affirm the District Court's calculation of damages.

## B. Hunts Point's U.C.C. Article 9 Defenses

■ Hunts Point argues that the District Court should have applied the principles of the New Jersey adaptation of U.C.C. Article 9, *see* N.J. Stat. Ann. § 12A:9–403(b), in resolving this case. This would have allowed Hunts Point to assert defenses against Westway and would have resulted in a finding that Hunts Point was not liable to Madison. Madison contends that it claimed Article 9 collection of accounts as an additional ground for relief against Hunts Point and, because the District Court found Hunts Point liable under contract law, it was unnecessary to reach Madison's Article 9 arguments, and therefore the District Court properly refused to consider Hunts Point's corresponding Article 9 defenses. The parties do not dispute that Article 9 applies to the NOPs at issue, but rather contest whether Hunts Point's Article 9 defenses provide it any appellate relief in light of Hunts Point's contractual liability to Madison. We agree with Madison that the District Court did not err in declining

to reach Hunts Point's Article 9 defenses in light of not deciding the preliminary issue of whether Hunts Point was liable to Madison under Article 9. Further, we are not persuaded by any case law Hunts Point has advanced that we are required to consider a defense to the statute absent a finding of liability under § 12A:9–403(b). Hunts Point argues that the District Court acknowledged in another case that "it appears that [Article 9] would apply under the New Jersey Appellate Division's recent decision in *21st Capital.*" *Capitalplus Equity, LLC v. Prismatic Dev. Corp.,* No. 07–321, 2008 WL 2783339, *5 (D.N.J. July 16, 2008). However, as we explained earlier, we find *21st Capital* factually distinct from the instant case, and we also find *Capitalplus* distinguishable because the defendant in that case never signed a waiver of defenses clause in its NOP-equivalent form, as Reingold did. *Id.* at *4, *8. Because Hunts Point has failed to convince us that we must apply Article 9 to resolve the instant appeal, and because it waived its defenses in signing the NOPs, our review of its U.C.C. claim would thus result in the same outcome as our analysis under common law contract principles. We therefore reject Hunts Point's arguments that it should be relieved of liability based on its purported Article 9 defenses.[5]

## C. Prejudgment Interest

■ Madison cross-appeals the District Court's denial of an award of prejudgment interest. We review this decision for abuse of discretion and, under New Jersey law,[6] a "district court may exercise [its] discretion [to award prejudgment interest] upon 'considerations of fairness' and prejudgment interest may be denied 'when its exaction would be inequitable.'" *Thabault,* 541 F.3d at 533 (quoting *Ambromovage,* 726 F.2d at 982). "[T]he purpose of prejudgment interest is to 'compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier.'" *Id.* (quoting *Ruff v. Weintraub,* 105 N.J. 233, 519 A.2d 1384, 1390 (1987)). "[T]he award of prejudgment interest on contract and equitable claims is based on equitable principles." *County of Essex v. First Union Nat'l Bank,* 186 N.J. 46, 891 A.2d 600, 608 (2006). Further, "[t]he trial court is vested with substantial discretion to award or deny pre-judgment interest in contract cases, and its exercise of such discretion will be sustained on appeal unless it consti-

5. Nevertheless, even if we agreed with Hunts Point that we should consider its Article 9 defenses, that does not mean it would prevail on such an argument. Hunts Point argues that Westway's assignment of the NOPs to Madison was not enforceable under N.J. Stat. Ann. § 12A:9–403(b) because Madison was not a holder in due course of the NOPs. The statute reads:

> [A]n agreement between an account debtor and an assignor not to assert against an assignee any claim or defense that the account debtor may have against the assignor is enforceable by an assignee that takes an assignment:
> (1) for value;
> (2) in good faith;
> (3) without notice of a claim of a property or possessory right to the property assigned; and

> (4) without notice of a defense or claim in recoupment of the type that may be asserted against a person entitled to enforce a negotiable instrument under 12A:3–305 a [i.e., a holder in due course].

N.J. Stat. Ann. § 12A:9–403(b) (formerly N.J. Stat. Ann. § 9–206); *see also* N.J. Stat. Ann. § 12A:9–109(a)(3). Although we need not, and will not, undertake a full analysis of each factor in the statute because we have already decided this appeal under contract principles, we express doubt that such an inquiry would prove fruitful for Hunts Point—particularly because it waived any defenses in signing the NOPs.

6. In a diversity action, we apply state law in determining prejudgment interest. *Jarvis v. Johnson,* 668 F.2d 740, 746 (3d Cir.1982).

tutes a manifest denial of justice." *P.F.I., Inc. v. Kulis,* 363 N.J.Super. 292, 832 A.2d 931, 936 (N.J.Super.Ct.App.Div.2003). Thus, we consider not whether we would have weighed the equities differently than the District Court did, but whether it abused its discretion in making its own determination. On these facts, we cannot conclude that it did.

## IV.

For the aforementioned reasons, we will affirm the District Court's order on the grounds that the five NOPs at issue are valid and enforceable contracts. However, we will reduce Madison's damages in the amount of $263,497.74 to credit Hunts Point for two additional payments it made to Westway. Finally, we will affirm the District Court's denial of prejudgment interest to Madison.